# SWIFT & COMPANY *v.* UNITED STATES ET AL.

No. 282.   Argued March 5–6, 1952.—Decided May 5, 1952.

*Frederick Bernays Wiener* argued the cause for appellant. With him on the brief were *Wm. N. Strack, Arthur C. O'Meara, John P. Staley* and *Ross Dean Rynder.*

*Daniel W. Knowlton* argued the cause for the United States and the Interstate Commerce Commission, appellees. With him on the brief was *Solicitor General Perlman. Samuel R. Howell* was also of counsel for the Interstate Commerce Commission.

*Douglas F. Smith* argued the cause for the Atchison, Topeka & Sante Fe Railroad Co. et al., appellees. With him on the brief were *Kenneth F. Burgess* and *Martin M. Lucente.*

*Lee J. Quasey* argued the cause and filed a brief for the National Live Stock Producers Assn. et al., appellees.

*Nuel D. Belnap* argued the cause for the Chicago Live Stock Exchange et al., appellees. With him on the brief were *Robert N. Burchmore* and *John S. Burchmore.*

*Guy A. Gladson* and *Bryce L. Hamilton* submitted on brief for the Union Stock Yard & Transit Company of Chicago, appellee.

Mr. Justice Minton delivered the opinion of the Court.

On July 28, 1947, the appellant, Swift and Company, filed a complaint, later amended, before the Interstate Commerce Commission against the Atchison, Topeka and Santa Fe and other railroads, alleging that the charges on direct carload shipments of livestock [1] from points outside Illinois to its proposed new plant in the Chicago Packingtown area are (1) unreasonable, (2) unduly prejudicial to livestock as a commodity, and (3) unduly prejudicial to Swift as against its competitors, all in violation of the Interstate Commerce Act.[2] Swift asked for the establishment of reasonable joint through rates for line-haul carriers serving Chicago and the Chicago Junction Railroad's lessee, the Chicago River and Indiana Railroad, hereafter called Junction,[3] such joint rates to

---

[1] The term "direct shipments" is used to denote shipments consigned directly to the packer for slaughter, as distinguished from those shipments consigned to commission men for sale in the public livestock market.

[2] 49 U. S. C. § 1 *et seq.* Sections 1 (4) and 1 (5) require the carriers to establish just and reasonable rates; § 3 (1) prohibits the carriers from giving any undue or unreasonable preference to any particular shipper or to any particular description of traffic.

[3] A line-haul carrier is a common carrier by railroad which transports livestock and other freight in interstate traffic, as distinguished from a carrier such as Junction, which performs services in a local switching area.

include delivery of livestock to Swift's industrial siding at its proposed plant and not to exceed the line-haul rates now in effect at the Union Stock Yards and other points of delivery on line-haul railroads in the area. Swift's proposed plant, near its present plant, will be located on Junction's rails and not on those of any line-haul carrier.

After Swift filed its complaint, Junction sought to file a new tariff cancelling the present one as it applies to livestock. The present tariff provides a flat charge for switching carload freight to and from industrial sidings and team tracks; under the new tariff, Junction would not have offered switching services for livestock under any circumstances. Swift and others objected, and the filing was suspended so that the Commission could hear Swift's complaint and Junction's request together on a consolidated record.

The Commission dismissed the complaint and refused to cancel the switching tariff as to livestock. *Swift & Co. v. Atchison, T. & S. F. R. Co.*, 274 I. C. C. 557. Swift then sought review of the Commission's order of dismissal by a statutory three-judge District Court. That court sustained the Commission's order, and this appeal followed pursuant to 28 U. S. C. §§ 1253 and 2101 (b). No question is raised as to the Commission's refusal to cancel the switching tariff.

All livestock shipments by rail to the Chicago area are handled solely by the line-haul carriers; delivery is direct to line-haul terminals at the line-haul rate. Such terminals are the Stock Yards and those unloading pens located on switches directly adjoining a line-haul carrier's rails. Swift is the one large packer in Chicago that has such a line-haul terminal and can receive all its direct shipments of livestock at line-haul rates. This terminal, the Omaha Packing Plant, a Swift subsidiary situated two and one-half miles northeast of Swift's present plant and outside the Stock Yards district, is located on the

rails of the Burlington Railroad, a line-haul carrier. Here Swift receives its direct livestock shipments, about 6,500 carloads annually, which it trucks to its plant in the Stock Yards area.[4] The balance of the livestock delivered in Chicago, whether direct or otherwise, is delivered to the Stock Yards, with some minor exceptions, by the line-haul carriers over certain Junction running tracks to the Stock Yards unloading pens. The carriers have trackage rights on these running tracks for which a charge is paid to Junction. On direct shipments to a packer delivered to the Stock Yards, the Yards' facilities, including a vast system of runways, overpasses and tunnels, are used to drive the livestock from the unloading pens to the packer's plant. The charges for these facilities are fixed by the Secretary of Agriculture. Junction has never switched or handled any livestock except in an emergency.

The delivery of livestock in the Stock Yards area is to be contrasted with that of "dead freight." [5] The line-haul carriers make no direct deliveries of dead freight; none of the approximately 500 industries in the area have plants located on line-haul rails and the line-haul carriers do not have trackage rights over the Junction rails which lead to the plants. Consequently, all dead freight is switched by Junction and delivered to the industrial sidings or team tracks alongside of and connecting with Junction's rails.

Since Junction provides only trackage rights for the livestock shipments to the Stock Yards, the line-haul rates on livestock do not include Junction as a participating carrier. Junction does participate, however, in joint

---

[4] The cost of this trucking to Swift is $50,000; it is much less than the cost of either consigning the livestock to the Stock Yards and paying for their yardage facilities or paying the switching charges here in issue and having the livestock delivered to the proposed plant.

[5] Dead freight is composed of commodities other than livestock.

rates for dead freight. For any switching operation not covered by line-haul rates in which Junction participates, Junction has a flat switching charge of $28.80 per car.[6] This charge would apply to any direct shipments at Swift's proposed plant in Packingtown which, as we have noted, is not located on any line-haul rails but rather on Junction's rails.

Trains for the Stock Yards are made up at the break-up yards of the line-haul carriers, located from a few to several miles from the Stock Yards. A train coming in from the west moves to the Ashland Yards of Junction, which are divided into the North and the South Yards. The North Yards are used for the receipt, separation, and distribution of cars of dead freight and empties outbound from the packers and other industries, while the South Yards are used for cars of dead freight inbound. This division is made by three parallel running tracks owned by Junction, numbered 1102, 1103 and 1104, over which the line-haul carriers are permitted to operate in and out of the Stock Yards. Sixty-three percent of the trains to the Stock Yards area are composed exclusively of livestock. The balance are consolidated trains, carrying both livestock and dead freight.

An all-livestock train moves by line-haul carrier, using its own crew and equipment, eastward over Track 1103 to the unloading pens in the Stock Yards and is there spotted for unloading. While the cars are being unloaded, the engine cuts off, passes around to the other end of the train and couples on; when the unloading is completed, the train returns westward over Track 1102 or 1104 through Junction's Ashland Yards and back to its break-up yards with the empties. This all-livestock train is

---

[6] This was the figure at the time this proceeding was heard by the Commission's examiner. Subsequent authorized increases have brought the charge to $39.24.

delivered to the Stock Yards in one movement by line-haul carriers for line-haul rates.

A consolidated train moves through the Ashland Yards from the break-up yards to a certain point on Track 1103, just as an all-livestock train. In this consolidated train, the dead-freight cars are hauled just behind the engine and the livestock cars in the rear. At a certain point on Track 1103 the dead-freight cars are cut out and switched into the South Yards upon one of the nine Junction receiving tracks, from which tracks Junction later moves the dead freight to the industrial sidings and team tracks of the packers and other industries located in the area. After the dead freight has been switched to the receiving tracks, the line-haul engine returns to Track 1103 to couple onto the livestock cars and move them to the unloading pens. While the dead freight is being switched to the South Yards, Track 1103, the only means of ingress to the Stock Yards from the west, is blocked by the livestock cars remaining on the track. Sometimes as many as four trains at a time are tied up by reason of the block on Track 1103.

An all-livestock train coming in from the east does not pass through the Ashland Yards but proceeds directly to the Stock Yards from the break-up yards. However, all dead freight moves through the Ashland Yards, as would all livestock to be delivered to Swift if its complaint were granted. The fact that most of the livestock shipments are handled by the western carriers makes this portion of the transportation operation unimportant for present purposes.

If this complaint were granted, livestock would move to Swift's proposed plant in the manner of dead freight. Instead of one movement, as the line-haul movement to the Stock Yards, there would be two movements—one to the receiving tracks in the South Ashland Yards made by the line-haul carriers, and the second movement by Junction

from its South Yards to Swift's plant, located on Junction's rails. The tie-up on Track 1103, described above, would be increased accordingly as trains consigned to the Stock Yards would have to place any of Swift's livestock cars on the Junction receiving tracks. The congestion and costs involved would be increased by the fact that livestock cannot be handled as easily as dead freight. Livestock cars cannot be "kicked" in switching operations as can dead-freight cars, which are stopped by collision with other cars. Livestock cars must be placed with a minimum of rough handling. Still further difficulties would be encountered because livestock must be unloaded, watered and fed every twenty-eight hours, in accordance with federal law. 45 U. S. C. § 71 *et seq.* When livestock arrives in Chicago, there are generally only a few hours remaining for delivery to unloading pens in order to comply with this law. Therefore, expeditious handling of the livestock is required, especially since there are no facilities along Junction's rails for such unloading, watering and feeding. Some 31 hours are required for a car of dead freight to clear Ashland Yards and be delivered. It is apparent that livestock must be handled in much less time.

If the complaint were granted, Swift would not pay for the second or switching movement by Junction. Although Junction has never moved livestock in the past except in an emergency, under existing tariffs it can charge Swift the switching rate of $28.80 per car now applied to other commodities. But if Swift is to obtain what it seeks, the line-haul carrier must establish as the line-haul rate a joint rate with Junction which is no higher than the present line-haul rate. This would mean that the line-haul carrier must absorb the switching charge, or that both the switching charge and the present line-haul rate must be decreased, with the line-haul carrier and Junction sharing in absorbing the amount of the decrease.

The delivery of livestock through this bottleneck of Ashland Yards must be geared to provide for the expeditious and special handling that livestock must receive. The huge quantities of dead freight which are handled [7] and the restricted facilities of Ashland Yards have resulted in the development, over a period of seventy years, of a complicated, intricate pattern of operation. For this reason, any attempt to change the pattern calls for the most expert consideration and administrative judgment—a task that courts are ill-fitted to perform. If the Commission gave weight to the relevant factors, its decision should not be overturned. We move then to the Commission's report.

The Commission found that in the circumstances presented the switching charge provided by the existing tariff would not be unreasonable or otherwise unlawful as applied to livestock, and secondly, that the establishment of joint rates for such transportation was not necessary or desirable in the public interest. It took account of the historical development of the Stock Yards and the delivery of livestock therein which together with the industrial development of the area have made further yard expansion impracticable. The Commission found that the switching yards are now highly congested and, as one witness put it, are "running bank full." While it is true that livestock shipments into the area have been decreasing, dead-freight shipments have increased severalfold, and the congestion will continue in the foreseeable future. The Commission gave careful consideration to the complication of operations through the additional and different switching movements required in the handling of livestock as contrasted with dead freight. Whether the

---

[7] During the years 1945, 1946 and 1947, an average of over 726,000 cars a year, loaded and empty, were funnelled through the Ashland Yards.

system for the delivery of livestock into Chicago which has existed for over seventy years at an established line-haul rate, and which has recognized definite terminals calling for a minimum of train movements in a highly congested area, should be displaced by another system which would further complicate the operations and would necessitate the use of properties and services not included when the present line-haul rates and terminals were fixed, is a question committed to the administrative judgment of the Commission. When that judgment is based on findings abundantly supported by the evidence on the whole record, as it is in this case, it is the duty of the courts to sustain it. *Ayrshire Corp.* v. *United States,* 335 U. S. 573, 593; *Interstate Commerce Commission* v. *Jersey City,* 322 U. S. 503, 522–523; *Swift & Co.* v. *United States,* 316 U. S. 216, 230–231; *Adams* v. *Mills,* 286 U. S. 397, 409–410; *Interstate Commerce Commission* v. *Union Pacific R. Co.,* 222 U. S. 541, 547–548.

The question of the reasonableness of the switching charge was posed to the Commission in the case of *Hygrade Food Products Corp.* v. *Atchison, T. & S. F. R. Co.,* 195 I. C. C. 553. There, Hygrade sought to have the railroads absorb the switching charge of Junction, but the Commission found that it was a reasonable additional charge to the line-haul rate. On appeal to this Court that finding was not disturbed. *Atchison, T. & S. F. R. Co.* v. *United States,* 295 U. S. 193. At that time the charge was $12 per car. It is now considerably higher, but the charges for other commodities and services have risen also.

The burden of showing that the switching charges were unreasonable was upon Swift. *Louisville & N. R. Co.* v. *United States,* 238 U. S. 1, 11. On this record, that burden was not sustained; the charges having existed for years and having been approved as reasonable by the Commission and tacitly approved by this Court, *Atchison,*

*T. & S. F. R. Co.* v. *United States, supra,* their reasonableness is presumed to continue in the absence of a showing to the contrary.

The fact that the rate is so high that Swift finds it uneconomical to use does not in and of itself establish the unreasonableness of the rate. A revision of the switching charge on the ground of its unreasonableness and the establishment of a reasonable rate for switching was not asked. Any rate in excess of the line-haul rate to the Stock Yards was considered by Swift as unreasonable, as it was demanding a joint rate *not in excess* of the line-haul rate to the Stock Yards. Unreasonableness is not made out by mere assertion. *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 602.

It is next argued that because dead freight is delivered to Swift's industrial siding at the line-haul rate, it is a discrimination against livestock as a commodity to impose a switching charge in addition to the line-haul rate for delivery of livestock to the same point. That argument is completely answered by the Commission's findings as to the different and more complex nature of the switching services required by livestock as compared with dead freight. The cost of the switching service performed by Junction in the delivery of dead freight is figured in the line-haul rate. The line-haul rate for livestock, the reasonableness of which is not in and of itself attacked here, has never contemplated such switching services because Junction has never performed them.

Reliance is placed by Swift upon the case of *United States* v. *Baltimore & O. R. Co.,* 333 U. S. 169. There, delivery to industrial sidings at line-haul rates had been the practice. The Cleveland Stock Yards sought to terminate such delivery because it owned a segment of the track used to serve Swift and wanted to prevent the use thereof unless livestock be routed through its yards and the charge therefor paid to the Stock Yards. In the al-

ternative, the Stock Yards wanted the carriers to pay the equivalent of such charge for the use of the Stock Yards' track leading to Swift's industrial siding. Such a plan would have discriminated against Swift because its competitors could get delivery without the use of the Stock Yards' track and hence would be unaffected by the Stock Yards' demands. This Court held that the Stock Yards could not use its track ownership to work a discrimination which Congress had said should not exist.

"Here Congress under its constitutional authority has provided that no railroad shall engage in certain types of discriminatory conduct in violation of three provisions of the Act. The Commission found that discriminatory conduct here. The excuse offered by the railroads is that the owner of Track 1619 required them to do the prohibited things. But the command of Congress against discrimination cannot be subordinated to the command of a track owner that a railroad using the track practice discrimination." *Id.,* at p. 177.

Delivery to an industrial siding at line-haul rates was there allowed by the Commission and sustained by this Court for the reason that the Stock Yards sought by its discriminatory act to upset the usual delivery procedure, while here, in a vastly more complicated operational setting, Swift would complicate it further by obtaining for itself a service at line-haul rates different from the usual delivery procedure and not contemplated or considered when the present line-haul rates to Chicago were fixed. If Swift were granted the relief it seeks here, it would be obtaining something that no other packer in Chicago receives, and, instead of being discriminated against, a discrimination would be granted in its favor. Swift already enjoys a competitive advantage because it can obtain direct delivery of livestock at its Omaha plant at

line-haul rates. It can hardly be heard to say that the present system favors its competitors in the Stock Yards' area.

Swift also failed in its burden of showing prejudicial treatment to it as opposed to its competitors in localities other than Chicago, who do receive delivery on industrial sidings at line-haul rates. These competitors' plants are located for the most part on line-haul carriers' rails, and no complicated switching movements are involved. Swift receives at Chicago, as elsewhere, the same rates and services as other packers similarly situated.

Junction is a subsidiary of the New York Central Railroad Company. The latter had an agreement with the Stock Yards which contained a provision that New York Central would operate Junction for "the benefit, advantage, and behoof of the business and affairs" of the Stock Yards. When this proceeding was begun before the Commission, Junction did not intend to defend it. Attorneys for the Stock Yards wrote a letter to the general counsel of New York Central, calling attention to the failure of Junction to defend and to the covenant in the agreement. They pointed out that Junction possessed the evidence necessary to meet the issue in Swift's complaint, that such evidence should be adduced, and that under the agreement, Junction was obligated to defend in order to avoid irreparable injury to the Stock Yards. Thereafter, Junction defended.

It is Swift's contention that this covenant is illegal. We do not find it necessary to pass upon that matter. As far as Swift is concerned, it does not receive any direct shipments at the Stock Yards; hence any decision as to livestock shipments to Swift would not affect the Stock Yards. If other packers would demand industrial siding delivery in the event Swift's complaint were allowed, unquestionably the effect upon the Stock Yards would be very material.

It is true that the Commission did give consideration to the probability that if Swift were successful, other packers might demand the same service. The likelihood of such demand seemed to the Commission, as it does to us, obvious. However, if this demand by other packers, reasonably forecast by the Commission, received consideration in reaching the conclusions in this case, it was in the light of the additional burden on the overcrowded condition of the area, the complexity of the operations, and the necessity for extra care in the handling of livestock to move it through the bottleneck at the Ashland Yards. The Commission was not led to such conclusions by giving weight to this covenant. It was wholly unnecessary thereto. The covenant's impact may be consistent with such consideration, but it is not shown to have been controlling in any manner, or relied upon by the Commission.

We have given consideration to other arguments put forth by Swift and find them to be equally without merit; they do not require discussion in this opinion.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE REED, with whom MR. JUSTICE DOUGLAS joins, dissenting.

I am not able to accept the conclusion of the majority that the Interstate Commerce Commission can on this record deny the appellant's prayer for joint through rates between the line-haul defendants and the terminal defendant, the Chicago Junction Railroad. It is admitted here that every manner of freight save livestock is delivered to private industrial sidings in the Chicago switching district under tariffs embracing joint through rates. When the Court concludes that it is not a "discrimination against livestock as a commodity to impose a switching charge in addition to the line-haul rate for delivery of livestock to the same point," it violates the statutory re-

quirement of equality between commodities. To accord joint through rates for switching to private sidetracks to all commodities save livestock, constitutes such a preference to those commodities over livestock as is proscribed by 49 U. S. C. § 3 (1). See note 2 of the opinion of the Court.

It is the law under the Interstate Commerce Act, as set out in § 3 (1), that the public interest is best served when common carriers accord equally reasonable treatment to all their patrons. To be sure, the law might be that the public interest is best served by avoiding congestion in order to pass the maximum amounts of traffic through a transportation bottleneck. But Congress has decided, both for the Commission and this Court, that the commonweal shall be served by guaranteeing that there shall not be discrimination between commodities by carriers. The difficulties of congestion, limitations on facilities, or other shipping disadvantages are to be borne equally by all shippers, otherwise the Interstate Commerce Commission could unreasonably prefer commodities through transportation orders, and in effect would be authorized to prescribe the manner in which goods shall be marketed in the public interest. The inadequacy of transportation facilities may not, in my opinion, be cured by penalizing one commodity for the benefit of the others.

When, as here, the carriers while fixing joint through rates for commodities in general fail to furnish them to shippers of livestock, on application the Commission should fix such rate. That rate should be established, 49 U. S. C. § 15 (3), in the same manner as similar rates for other commodities, of course with proper consideration of the costs of handling the respective commodities. I consider it no answer on this record to say that the switching charge may be no more than the difference in cost of handling dead freight and livestock.

The shipper is entitled to meet that problem when the Commission comes to determine the switching factor in the joint through rate. Joint through rates should be accorded to livestock shipments on Swift's siding. Then, and not until then, if the rate is attacked as unreasonable, may the Court properly rely on the fact, if supported by a finding of the Interstate Commerce Commission, that the "more complex nature of the switching services required by livestock as compared with dead freight" makes justifiable the difference in the rates. See majority opinion, p. 383. The reasonableness of any commission increase of livestock rates over other commodities should depend upon evidence and findings showing its necessity because of the extra cost of handling without regard to congestion.

I would reverse.

MR. JUSTICE FRANKFURTER, dissenting.

The conflicting views of my brethren imply serious differences in interpreting the meaning and scope of the report of the Interstate Commerce Commission. Plainly, therefore, that report does not speak with the needed clarity. Therein lies my difficulty with the case. If what the Commission has done is ambiguous, how can I decide whether it was authorized to do what it did? Dubiety in the administrative order precludes intelligible judicial review.

As the Court views the matter, the Commission had before it merely a rate-fixing controversy and more specifically whether relevant transportation considerations justified imposition of a local switching charge of 4.8 cents per 100 pounds* in combination with the line-haul charge as a fair rate for delivery of livestock to private sidings. And

---

*This rate, in effect when the hearing was held, was based on a minimum of 60,000 pounds.

the record, according to the Court, amply sustains the finding of the Commission that such a combination did not constitute an unreasonable rate. MR. JUSTICE REED and MR. JUSTICE DOUGLAS interpret the order not to be a rate-fixing order at all, but, in effect, a determination by the Interstate Commerce Commission that livestock, unlike all other commodities, may be excluded from private sidings in the stockyards area, although this is done not in terms but by a designedly preferential rate. The difficulty is, of course, intensified in that the rate is in fact prohibitive.

Where, as here, this Court can draw only conflicting strands of reason from the explanation given by the Interstate Commerce Commission, we have not been spoken to with sufficient clearness. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 511. Therefore, I think the decision below should be reversed with direction to remand the case to the Interstate Commerce Commission for appropriate action.