A. LINDBERG & SONS, INC., a corporation, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

No. M–20–73 CA.

United States District Court, W. D. Michigan, N. D.

March 3, 1976.

Aaron Lowenstein, Negaunee, Mich., for A. Lindberg & Sons.

John H. D. Wigger, Dept. of Justice, Washington, D. C., for the U. S.

Manny H. Smith, I. C. C., Washington, D. C., for the I. C. C.

Before ENGEL, Circuit Judge, FOX, Chief District Judge, and MILES, District Judge.

ENGEL, Circuit Judge.

This is an action brought before a three-judge district court by A. Lindberg and Sons, Inc., under 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325, to review, vacate and set aside a decision and order of the Interstate Commerce Commission dated July 11, 1972 and entered in docket No. 35358, *A. Lindberg and Sons, Inc. v. Chicago and North Western Transportation Co., et al.* The order complained of adopted, with modifications, the report and order recommended by the hearing examiner denying all relief to Lindberg as complainant.

The proceedings before the Interstate Commerce Commission were handled under the modified procedure as set forth in Rules 45–54 inclusive, of the Commission's General Rules of Practice 49 C.F.R. § 1100.45–54. Charges and issues involved were presented by the filing of verified statements, exhibits and arguments related thereto. Lindberg's complaint before the Commission alleged that the defendant railroads had violated §§ 1(5), 2 and 3(1) of Part I of the Interstate Commerce Act, 49 U.S.C. §§ 1(5), 2, 3(1) when the railroads refused to extend to Lindberg certain reduced rates which were published in tariffs pertaining to the shipment of bentonite clay to certain taconite plants.

### THE FACTS

Lindberg is engaged in the business of highway and heavy construction in the

Upper Peninsula of Michigan. In 1970 it entered into a contract with Rust Engineering Company, the prime contractor in a development project for the Mead Corporation, at its paper mill located at Groos, Michigan, just north of Escanaba. Lindberg's part in the project was to build a watertight lining for a pulp mill sediment pond. For this purpose, it ordered 8,720 tons of bentonite clay from the American Colloid Company. Bentonite is a high quality clay which has as its principal characteristic a high propensity for liquid absorption. Its principal use is as a cohesive or binder. While similar clays, called subbentonites, can be found elsewhere and in foreign countries, they have a lesser propensity for liquid absorption. The primary source of bentonite is the Black Hills area centering about Belle Fourche in western South Dakota and Upton in eastern Wyoming. This lawsuit involves the shipment of the 8,720 tons of bentonite from Belle Fourche to Groos, a distance of about 1400 miles, and the rates charged by the intervenor railroads on those movements.[1]

The rates for the shipment of bentonite from Belle Fourche was earlier challenged in a complaint filed July 17, 1961 in *American Colloid Company v. Akron, C. & Y. R. Co.*, 321 ICC 92, and was directed to the carload rates on bentonite clay from Belle Fourche to points in the western trunkline and the official territories, it being claimed that the rates were violative of §§ 1 and 3(1) of the Act. The § 1 claim challenged the reasonableness of the published rates. After extensive investigation and findings concerning comparative rates and costs, it was found by the Commission that

". . . the record does not establish that the revenue-cost relationship

under the assailed rates results in unreasonably high profits for the defendants". 321 ICC at 109

It is noteworthy for our purposes here to observe that in finding the rates not to be unreasonable, the Commission recognized that the rates from Belle Fourche were blanketed over wide geographic areas and bore little relationship to distance.[2] It is this basic rate found not unreasonable in American Colloid, as stepped up from time to time by general increases, which Lindberg was obliged to pay for the transportation of the bentonite it purchased from American Colloid. Thus, for the shipments of bentonite delivered to Groos in 1970, Lindberg paid $19.48 per ton and for those in 1971, it paid $22.02 per ton.

In 1964 interested steel and iron ore companies joined together to apply for a special lower rate for the shipment of bentonite to taconite plants located in Michigan and Minnesota, including shipments of taconite to the Empire Mine in Marquette, Michigan, a distance of approximately 50 miles beyond Groos on the line of shipment from Belle Fourche and other stations where the bentonite originated. In the iron ore pelletizing industry bentonite is used to produce iron ore pellets extracted from the low grade taconite found in Minnesota and Michigan. Approximately one net ton of clay is used in the production of 125 long tons of pellets.

Large quantities of the clay are demanded by the industry, and in 1969, 363,219 net tons of bentonite were so consumed. The application cited as reasons for the proposed reduced rates that:

"Iron ore pelletizing plants with very large total capacity are now operating

---

1. The Chicago and North Western Transportation Co., The Escanaba and Lake Superior Railroad Co. and the Soo Line Railroad Co., defendants in the proceedings before the Interstate Commerce Commission, have intervened pursuant to 28 U.S.C. § 2323 and Rule 24(a), Fed.R.Civ.P., in this action.

2. As an example, in *American Colloid*, supra, a commodity rate of 79 cents was applied to distances from Belle Fourche of between 626 and 992 miles. *American Colloid*, supra, 321 ICC at 95.

or are under construction at these destination points and reduction is necessary to prevent the pellet producers from turning to import clay by water from European sources and depriving movement of western clay."

Accordingly reduced rates were published for bentonite moving from stations in Wyoming and South Dakota to stations in Michigan and Minnesota with the result that the rate per ton to the Empire Mine in 1970 was $11.91 or $7.57 less than the $19.48 rate paid by Lindberg. Likewise in 1971 the rate was $13.46 or $8.56 less than the $22.02 paid by Lindberg.

While rates to taconite plants in Minnesota and Michigan from all origins were equalized without regard for distance, the reduced rate was conditioned upon shipment of a minimum of 100,000 pounds of clay per cars of 2400 cubic feet or less, and 140,000 pounds of clay in cars exceeding that capacity. Likewise, the rate was made applicable only on clay used as a binder in the production of iron ore pellets "which receive a subsequent movement by rail or water".

Lindberg claims that upon making inquiry into the source of the required clay, it contacted the Johns-Manville Company. On May 19, 1970, Mr. Robert Fee, district manager of Johns-Manville, wrote Lindberg in part:

"Referring to our letter of quotation on supply of Bentonite, we have now learned from the Railroad that if we give them notice within the next two weeks we are assured of a freight rate of $11.34 per ton for this movement, rather than the $18.60 shown in our quotation letter."

While the authenticity of the letter from Johns-Manville seems not to be disputed, there was no further evidence of record as to what individual from the railroads might have furnished such information and beyond that, from which railroad such individual might have come, and accordingly the hearing examiner and the Commission saw fit to give only limited weight to the letter, it being essentially unsupported hearsay. It was also claimed by Lindberg that upon the strength of the Johns-Manville letter, it submitted a bid on the Mead job based upon anticipated freight rates as published for and applicable to the taconite plants. It is not shown that this alleged reliance upon the reduced rate was brought about by any conduct or representations by the carriers. Johns-Manville was never called upon to make good on its reduced quotation and apparently Lindberg proceeded to deal directly with American Colloid in purchasing the needed bentonite.

## SCOPE OF REVIEW

Judicial review of orders of the Interstate Commerce Commission is narrowly limited. 5 U.S.C. § 706(2) provides in relevant part:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\*   \*   \*   \*   \*   \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

\*   \*   \*   \*   \*   \*

(E) unsupported by substantial evidence . . .

\*   \*   \*   \*   \*   \*

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

Each of the above-quoted subsections provides a separate standard for review. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Under § 706(2)(E), our scope of

review is limited to a determination of whether the Commission's findings are supported by "substantial evidence". *Ill. Central R. Co. v. Norfolk and Western R. Co.*, 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966). The Supreme Court has defined the term "substantial evidence" as:

"... 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'" *Ill. Central R.R.*, supra, at 66, 87 S.Ct., at 260, *N.L.R.B. v. Columbian Enameling and Stamping Co.*, 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

■ We may not reverse the findings of the Commission simply because we might draw different inferences from the evidence. It is the job of the Commission to make findings of fact and the court may not substitute its own conclusions for those fairly drawn by the Commission from the evidence. *United States v. Pan American Petroleum Corp.*, 304 U.S. 156, 58 S.Ct. 771, 82 L.Ed. 1262 (1938), *Ill. Central R. Co.*, supra, 385 U.S., at 69, 87 S.Ct. 255.

■ Under § 706(2)(A), Commission action may also be set aside if it is "arbitrary and capricious". Under this standard Commission action will be sustained if there is a rational connection between the facts found and the conclusions reached. *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, supra. We consider "whether the decision was based on a consideration of the relevant factors and whether there was been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28

L.Ed.2d 136 (1971). In short, our inquiry is limited "to ascertaining whether there is warrant in the law and the facts for what the Commission has done." *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946).

## THE SECTION 3(1) CLAIM

Lindberg argues that the imposition of a higher rate on the bentonite shipped to him than that imposed on the bentonite shipped to the taconite plants subjected him to an "undue or unreasonable prejudice or disadvantage" under § 3(1) of the Act. Section 3(1)[3] "broadly prohibits any common carrier by rail from giving 'any undue or unreasonable preference' to any person, locality or type of traffic". *American Trucking v. A.T. & S.F.R. Co.*, 387 U.S. 397, 411, 87 S.Ct. 1608, 1616, 18 L.Ed.2d 847 (1967).

■■ The requirements of proof necessary to support a finding of a violation of § 3(1) are established. It must be shown (1) that there is a disparity in rates, (2) that the complaining party is *competitively* injured, actually or potentially, and (3) that the carriers are the common source of both the allegedly prejudicial and preferential treatment. If the complainant establishes these three factors, the burden is put upon the carriers to show that the disparity was justified by transportation conditions. *Chicago and Eastern Illinois Railroad Co. v. United States*, 384 F.Supp. 298 (N.D. Ill.1974), *aff'd* 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), see also *Cudahy Packing Co. v. Atchison, T. and S. F. Ry. Co.*, 234 ICC 569; *Wertheimer Cattle Co., Inc. v. Chicago B and Q R. Co.*, 318 ICC 167.

---

**3.** 49 U.S.C. § 3(1) provides:

It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any

particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description.

Although complainant here has shown that a disparity in rates existed, it has not alleged or shown that this disparity caused it competitive injury. It is not claimed that Lindberg is in competition with the taconite producers who receive the lower rates. Indeed, as noted earlier, the taconite producers use bentonite for an entirely different purpose than does Lindberg. It is nowhere alleged that any competitor of Lindberg is afforded the lower rates that the taconite producers receive. A showing of competitive injury, we think, is essential to support a finding of undue prejudice and preference under this section of the Act. Since this has not been shown, Lindberg's claim under § 3(1) must fail.

### SECTION I(5) CLAIM

Lindberg has claimed that the rates charged it were unjust and unreasonable and as such, were imposed in violation of § 1(5) of the Act:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful." 49 U.S.C. § 1(5)

This section of the Act adopts the general common law rule that the charges made by carriers for the transportation of property shall be reasonable and just. *Interstate Commerce Commission v. Baltimore & Ohio R. Co.,* 145 U.S. 263, 276, 12 S.Ct. 844, 36 L.Ed. 699 (1892). The question of the reasonableness of transportation charges is principally one of fact. *Illinois Cent. R. Co. v. Interstate Commerce Commission,* 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128 (1907); Pennsylvania R. Co. v. United States, 315 F.2d 460 (3rd Cir. 1963), *cert. denied* 375 U.S. 814, 84 S.Ct. 47, 11 L.Ed.2d 50 (1963).

In support of its § 1(5) claim, Lindberg relies almost solely upon the disparity between the rates charged it and those charged the taconite plants. It argues that because the rate it paid was about 63% higher than paid by the taconite plants, as a matter of law it must follow that the higher rate is unreasonable within the meaning of the statute. All of the particular allegations concerning this charge in the amended complaint are merely variations of this single fact of rate disparity alone. Lindberg argues that if the taconite plants had been required to pay the standard rate, their freight charges would have been increased by $525,000 in 1970 and $575,000 in 1971. Since the railroad companies presumably were able to make a profit charging the reduced rates to the taconite producers, Lindberg argues that the higher rates charged it are presumptively unreasonable.

The Commission rejected this argument without further proof, observing that subsequent publication of the lower rates for the taconite plants places them within a "zone of reasonableness", but does not *ipsa facto* render the existing level of rates unreasonable:

"Depressed rates are not a standard of maximum reasonableness. *Atlantic Creosoting Co., Inc. v. Southern Ry. Co.,* 323 I.C.C. 533. Within the zone of reasonableness the carriers' discretion must not be disturbed. There is no showing that the rates assailed are too high for the services rendered. No cost evidence for this purpose was tendered." (Hearing Examiner's Report and Order, p. 8)

We readily agree that the proof of other rates charged for comparable services is relevant in the overall determination of the reasonableness of the assailed rate. *Scott Paper Co. v. United States,* 372 F.Supp. 721 (E.D.Pa.1974), *aff'd* 419 U.S. 807, 95 S.Ct. 26, 42 L.Ed.2d 38 (1974). Such evidence is, however, by no means controlling, for both the Commission and the courts have consistently recognized that there is a "zone of reasonableness" within which carriers must be free to adjust their rates. *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *United States v. Chicago, M., St.*

*P. R. Co.*, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935); *Scott Paper Co. v. United States*, supra. While other rates and differences therein are relevant to the inquiry of reasonableness under § 1(5), proof of them is not necessary, and we cannot agree that such evidence necessitates a finding that the assailed rates are unreasonable.

▇▇▇ It is true that the difference complained of here is on its face great. We cannot, however, fault the Commission for failing to hold as sought by Lindberg that the higher rate is unreasonable and that the lower rate is the only reasonable rate which would obtain under the circumstances. This is particularly so in view of the prior determination *American Colloid Co. v. Akron C & Y R. Co.*, supra, in which the assailed rates were found not to be unreasonable at that time.[4] Further, it is clear that in a proceeding where a complainant challenges an existing approved rate as violative of § 1(5), the burden is upon the complainant to show the rate to be unreasonable. *Swift & Co. v. United States*, 343 U.S. 373, 72 S.Ct. 716, 96 L.Ed. 1008 (1952), *National Gypsum Co. v. United States*, 353 F.Supp. 941 (W.D. N.Y.1973). Complainant introduced no evidence concerning the carriers' costs or profits, but relied solely upon the disparity in rates. Under such circumstances, we will not disturb the Commission's finding that the rates charged Lindberg were not unreasonable. Accordingly, we agree with the Commission that the § 1(5) claim must fail.

## SECTION 2 CLAIM

By its amended complaint filed with the Commission, Lindberg claimed damages for pecuniary loss resulting from a violation of § 2[5] of the Act when the railroads charged it the higher rates, at the same time offering to Johns-Manville and the taconite producers a substantially lower rate. It further alleged that

> "Substantially similar conditions existed as to hauling to the same general area for the pelletizing plants and for Complainant who ordered fifteen cars of bentonite at a time, requiring about two carload shipments a day."

The proofs submitted by Lindberg further showed that each carload it had ordered from American Colloid exceeded in weight the minimum requirements for receipt of the lower rate, the average load carried in each car being substantially greater than the 140,000 pound minimum. Lindberg further established and the Commission found that Groos, where the shipments were delivered, was along the line of traffic from Belle Fourche to the taconite plants located at Empire, Michigan, and was in fact 50 miles closer. There is also no question that the identical material was involved and that the same type of railway car was required. For these reasons Lindberg claimed that the railroads, in charging it a far greater rate than that charged the taconite plants for "a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions", violated § 2 of the Act.

In rejecting this claim, the Commission adopted the following findings of the hearing examiner:

> "Section 2 relates to personal discrimination. Complainant's only evidence pertinent to this alleged violation is the letter informing Lindberg of rail-

---

4. Lindberg has not specifically charged that the periodic across-the-board increases added to all forms of traffic by the railroads were themselves unreasonable.

5. 49 U.S.C. § 2 provides:

    If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.

road willingness to publish a reduced rate to Groos, Mich. This letter was sent by an official of Johns-Manville. At best it is self-serving. There is no evidence that such a reduced rate ever became the subject of a proposal before the WTL rate committee. No traffic has been moved for Johns-Manville at rates and charges less than those accorded complainant. There is therefore in fact no indication that any personal discrimination has occurred. The reduced rates to the taconite plants are not pertinent under Section 2 since the Commission has long held that such violations originate only when different rates are assessed different persons on the same or similar traffic moving from and to the same places. . . .

Here complainant does not compete with any user of bentonite at Groos for which a lesser charge was published or made. If it may be accepted that an offer for a reduced rate was made by an unidentified railroad to Johns-Manville, that rate was never published and no bentonite traffic was ever shipped by Johns-Manville to Groos at either the proffered rate or the published rate. In such circumstances no competitor has received any advantage over complainant and there is in fact no discrimination. Where no discrimination has been evidence, there cannot exist any unjust discrimination, the particular type of conduct which section 2 prohibits." (Hearing Examiner's Report pp. 6, 7)

█ We commence our consideration of the § 2 issue with the recognition that for our purposes here at least, the reasonableness of the charges in the context of § 1 of the Act has been established. Unjust discrimination is the target of both §§ 2 and 3 of the Act. While § 3 is broader in its definition of the scope of activity banned, the thrust of § 2 is unjust discrimination in the charges and rates for railroad service, including particularly favoritism in the form of extension of preferential rebates. It is apparent from the reading of the statute and

from the case law interpreting it, that to prove a violation of § 2 there must be proof of the charging of different rates for like and contemporaneous service under substantially similar circumstances and conditions. See e. g. *Ayrshire Collieries Corp. v. United States*, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1943), *United States v. Union Stock Yard & Transit Co. of Chicago*, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226 (1912).

As we read the holding of the Commission in the adopted opinion and in its briefs filed in this court, Lindberg was denied this relief upon a ruling that as a matter of law, a violation of § 2 could only occur when there was a showing of disparity of rates between competitors. In addition, the Commission assumed that since the destination of the bentonite shipments differed by 50 miles that the reduced rates to the taconite plants were not pertinent because the freight had to move to the same places, citing in support thereof the Commission's decision in *Pickup and Delivery—Official Territory—L.C.L. and A.Q.*, 314 ICC 313, 318.

We are unable to agree that either the absence of an identity of destination or the absence of proof of competition of necessity makes § 2 inapplicable here.

As mentioned earlier, the lower tariff applies to taconite plants throughout Michigan and Minnesota with extremely varying distances from the source of the bentonite. The same is true of the general rate which in the *American Colloid* case, supra, was shown to apply at distances varying between 626 and 992 miles. (See footnote 2, infra).

█ The approximate distance from Belle Fourche to the area involved here is 1400 miles. The statute speaks in terms not of identical conditions, but of substantially similar circumstances, and we conclude that under the circumstances here it was error for the Commission to have held because Groos and the Empire Mine are not identical destinations from Belle Fourche that as a matter of law § 2 was inapplicable. This is partic-

ularly true in the absence of any suggestion, let alone proof, that that difference in distance in fact made any difference in economic impact.

■ The Commission has cited several cases which it argues support its contention that Section 2 applies only where the compared transportation moves to precisely the same destination. *Pickup and Delivery—Official Territory—L.C.L. & A.Q.*, supra, *Standard Milling Co. v. Illinois Central R. Co.*, 321 ICC 252 (1963), *Lynchburg Traffic Bureau v. United States*, 225 F.Supp. 874 (W.D.Va. 1963), *aff'd* 377 U.S. 270, 84 S.Ct. 1348, 12 L.Ed.2d 305 (1964). We do not think that the language of the Act supports this narrow reading. The language of Section 2 refers to "substantially similar circumstances and conditions". We readily agree that the question of whether the shipments in question were made under substantially similar circumstances and conditions is a question of fact for the Commission to decide. *Barringer & Co. v. United States*, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943). But as we read the Commission's decision, § 2 was held to be inapplicable *per se* because the shipments were not to the same points. We find this conclusion inconsistent with the language of the Act.[6]

■ We likewise believe it was error for the Commission to hold that a violation of § 2 could only be found where a discrimination between competitors was shown. The statute makes no mention of competition but is directed to discrimination in rate-fixing between shippers in the transportation in a like kind of traffic under substantially similar circumstances and conditions. We believe that the Commission erred in concluding that because the proof of injury to the plaintiff nearly always is based upon injury measured by the complainant's inability to compete with others who enjoy even more favorable rates, proof of competitive injury is absolutely necessary to support a finding of a Section 2 violation.[7]

The issue of whether a showing of competitive disadvantage is necessary to sustain a finding of violation under § 2 was presented to the court in *Interstate Commerce Commission v. Balt. & Ohio R. Co.*, 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912). There the question was whether a railroad could charge a shipper a rate for shipment of fuel coal to a given point different than that charged for shipment of commercial coal. The railroad argued that the fuel coal so shipped was not in competition with the

---

**6.** In *Barringer and Co. v. United States*, supra, The Supreme Court was faced with the issue of whether tariffs, approved by the ICC, which eliminated a loading charge on cotton moving from points in Oklahoma to certain points on the Gulf of Mexico while retaining it on cotton moving to the Southeast, violated § 2. The Court held that considering the truck competition to the Gulf ports faced by the railroads, the Commission's determination that remission of the loading charge to Gulf port shippers did not violate § 2 of the Act was not erroneous.

In the Supreme Court, the Commission argued that as a matter of law § 2 had no application because the shipments in question were not for the same distance and to the same destination. Although the majority opinion did not address this contention, four members of the Court in dissent felt that this construction of the statute was incorrect. *Barringer & Co.*, supra, at 15, 16, 63 S.Ct. 967 (Douglas, J. dissenting). As noted therein, nothing in the language of § 2 or in Supreme Court opinions

interpreting it leads to the conclusion that § 2 is applicable only where identical conditions exist.

**7.** While proof of competitive injury appears to be a necessary element to establish a violation under § 3(1) of the Act, see e. g. *Chicago and Eastern R. Co. v. United States*, supra, we find no judicial interpretations of § 2 suggesting proof of such competitive injury is necessary under § 2 of the Act. Even in the case of *Pickup and Delivery—Official Territory—L. C.L. and A.Q.*, supra, relied upon by the hearing examiner to support his holding that the § 2 claim must be dismissed for failure to prove competitive injury, the Commission merely held that *in general* such injury must be shown. Section 3(1) looks to prejudice and preference, which we think implies a showing of competitive injury. Section 2, on the other hand, is directed to discrimination among shippers and prohibits such discrimination even though the shippers may not be competitors.

commercial coal consigned to the same point, thus making § 2 inapplicable. The Supreme Court rejected this contention, noting that the fact of competition was extraneous to the issue of whether discrimination had occurred.

We recognize that in most cases to prove damages as required by § 8[8] of the Act, a shipper suing under § 2 will be required to show that he has been injured by the alleged discrimination. Usually such a showing will involve proof of competitive injury which appears not to be present in this case. It is not enough that a shipper simply show that he was required to pay a higher rate than other shippers were charged. *Penna. R.R. Co. v. International Coal Co.*, 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913), *I. C. C. v. United States*, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933).

Here, in an obvious endeavor to bring itself into conformity with the pecuniary loss standard, Lindberg has alleged a measure of damages based upon a claim that it in good faith believed that it was entitled to the lower rate and accordingly entered into contractual arrangements for the furnishing of the bentonite to the Mead project which resulted in a loss of the profits to which it would have been entitled had it not been discriminated against. We note that the claim of damages as so alleged has not been addressed by the Commission and we conclude it is not without our domain to speculate what result it might reach

with respect to these or other proofs of pecuniary damages.

While we rely primarily upon what we consider to be errors of law committed by the Commission in reversing its determination on Lindberg's § 2 claim, we also find certain findings of fact made by the Commission not supported by substantial evidence. 5 U.S.C. § 706(2)(E).[9]

The hearing examiner's report (as adopted and modified by the Commission) found that the lower rates charged the taconite plants was justified because of the threat of competition from clays imported from Europe by water. While courts have uniformly recognized differences in competitive conditions are a legitimate basis for differences in the rates charged for transportation of a product, *Barringer & Co. v. United States*, supra, 319 U.S. at 13, 63 S.Ct. 967 (and cases cited therein), the threat of competition must be real and substantial and not conjectural. *Saskatchewan Minerals v. United States*, 253 F.Supp. 504 (W.D.Wash.1966) *judgment vacated on other grounds*, 385 U.S. 94, 87 S.Ct. 254, 17 L.Ed.2d 192 (1966).

Here the evidence before the Commission does not support a claim that the difference in rates was justified by the threat of potential competition from foreign bentonite. The only evidence supporting this finding was the assertion of the railroads in their 1964 application for the reduced rates that such rates were necessary to prevent the taconite plants from turning to bentonite

---

8. 49 U.S.C. § 8 provides:

In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

9. We recognize that the hearing examiner's decision as adopted by the Commission relied to some extent upon the factual findings which we consider not supported by substantial evidence in dismissing Lindberg's § 3(1) and § 1(5) claims. However, for the reasons stated in the sections of the opinion dealing with those claims, we feel Lindberg failed to meet its burden of proof on essential elements of each of these claims. Thus the errors committed by the Commission in its evaluation of the evidence were not prejudicial to Lindberg insofar as the § 3(1) and § 1(5) claims are concerned.

imported from Europe. However, the evidence showed that bentonite produced in the Belle Fourche area was in many ways of higher quality than European bentonite. Further, the evidence showed that imports of foreign bentonite were so insignificant in contrast to United States production that no reasonable carrier could rely upon this circumstance as a basis for a rate differential.[10] While the minimal amount of foreign imports may not be controlling on the question of competition, we think under the circumstances to remove the claim from pure conjecture it was incumbent upon the railroads to produce more tangible or credible evidence in support thereof before the Commission was entitled to credit the claim.

Another reason for the rate differential set forth in the adopted report was the finding that "The lower rates are proportional rates designed to encourage increased use of bentonite clay at the pelletizing plants, which are located in a depressed area, the Upper Peninsula of Michigan". (Report of the hearing examiner, pages 4 and 5). We find no evidence in the record to support such a finding. In addition, if such were the fact, it would apply with equal force to the shipments to Groos which, like Empire, is also in the Upper Peninsula of Michigan.

█ Finally, the principal justification for distinction between the shipping rates charged the taconite producers and those charged other bentonite shippers in the same area is that the depressed rate accorded the former is warranted by the economies of volume and as well the fact that the taconite plants furnish the carriers with other business. The rates only apply, for example, to clay used in the production of pellets which receive a subsequent movement by rail or by water from the point of production. It has been at least suggested that the rail-road cars which are used to haul the bentonite clay from Wyoming to the Upper Peninsula, after unloading, are available to carry the outbound iron pellets from the taconite plants, thus achieving an economy. To the extent that this is a claim, such finding is not supported by any evidence in the record.

The railroads have tried to justify granting the depressed rate to the taconite plants but not to Lindberg upon the basis that regular volume shipments to the taconite plants are assured year in and year out, rather than upon an isolated basis. Further, they claim that the taconite plants' use of railroad facilities for shipping the pellets which they produce generates enough additional income to the railroads to warrant the lower rates on the bentonite shipments. We have no quarrel with a rate structure which recognizes a difference in rates on the basis of volume where it is shown that the reduction for volume shipment reflects significant cost economies. We seriously question, however, the propriety of justifying a lower rate on the basis of bigness alone and on the basis that the bigger customer is to be preferred because he does other profitable business with the carrier. Cf. *Central & Southern Motor Freight Tariff Ass'n v. United States*, 273 F.Supp. 823 (D.C.Del.1967). If the lower rate is to be justified on a finding that economies are achieved by the volume shipments to the taconite plants, we believe more probative evidence to support such a finding must be presented.

## CONCLUSION

Accordingly, we have determined that the matter ought to be remanded to the Commission and that the order appealed from be vacated. Upon our review of the administrative record, we have concluded that fairness to the complainant requires that the case be re-opened before the Commission and that the Com-

---

10. Thus in 1964 a total of 179 tons of foreign bentonite were shipped to the United States in contrast to 1.9 million tons of United States production. By 1969, foreign imports had dropped to 76 tons as compared with United States production of 2.6 million tons.

mission be accorded the opportunity to review its findings and decision in the light of this opinion. Our conclusion is based upon our finding that a decision of the Commission which is based upon important findings not supported by the record before it must be deemed to be "arbitrary", 5 U.S.C. § 706(2)(A), and further, that in the consideration of its claim, Lindberg was entitled to an application by the Commission of the proper legal principals. Since the Commission has not addressed itself directly to the pecuniary loss claim of the plaintiff under § 2, but rather concluded that it need not be reached, we believe a remand to the Commission on this claim is warranted.

Accordingly, so much of the order of the Commission as denies relief under Section 2 of Part I of the Interstate Commerce Act is vacated and the cause remanded to the Commission for further proceedings not inconsistent herewith.