**LOUIS DREYFUS CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**

No. 73 Civ. 79.

United States District Court,
S. D. New York.

March 6, 1975.

Ira J. Greenhill, New York City, for plaintiff, by Andrew P. Goldstein, Washington, D. C., and Rodman Kober, Louis Dreyfus Corp., New York City, of counsel.

Hanford O'Hara, and Fritz R. Kahn, Gen. Counsel, I. C. C., Washington, D. C., for Interstate Commerce Commission.

Mark M. Hennelly, R. H. Stahlheber, Richard S. M. Emrich, III, St. Louis, Mo., and Leon Leighton, New York City, for intervening defendant Missouri Pacific Railroad Co.

Before LUMBARD, Circuit Judge, and BONSAL and CONNER, District Judges.

## OPINION

LUMBARD, Circuit Judge:

This is an action to enjoin and set aside an order of the Interstate Commerce Commission ("Commission") upholding a rate reduction by intervenor-defendant Missouri Pacific Railroad Company (MoPac) applicable to the movement of wheat and soybeans from some fifty stations, located primarily on one MoPac line along the Arkansas River, to five Louisiana ports at Ama, Baton Rouge, Myrtle Grove, New Orleans and Port Allen. Plaintiff Louis Dreyfus Corporation (Dreyfus) operates a three-million-bushel, export-grain elevator at Pascagoula, Mississippi, which under prior rate schedules had enjoyed substantial rate equality with the above Louisiana ports on shipments from many MoPac origin points on the Arkansas River. Dreyfus challenges the Commission's finding that the rates were compensatory, and therefore not unjust or unreasonable, see 49 U.S.C. § 1(5), and the Commission's determination that a change in the rate relationship between ports was not unduly prejudicial to Dreyfus because of increased

barge competition, differing transportation conditions to Pascagoula, and Dreyfus's failure to show how its business had been affected by the rate reduction, see 49 U.S.C. § 3(1).

## I. Background

In February 1970 MoPac filed proposed rate reductions for three classes of carload shipments of wheat and soybeans [1] from stations along the Arkansas River to five ports it served in the New Orleans area.[2] The rates were to become effective October 3, 1970. The proposed reductions were very substantial—sometimes as much as one-third. For example, the rate from Dardenelle, Arkansas, to the five ports was cut from thirty to twenty cents per hundred pounds.

MoPac attributed the need for substantial rate reductions to increased barge competition from affected origin stations. In 1969 and 1970, as a result of a federally funded project, the Arkansas River had been opened to barge traffic for the first time. One hundred seventeen miles, from Little Rock, Arkansas, to the Mississippi River, had been opened in January 1969. This navigable portion had been extended eighty-two miles upriver to Dardenelle, Arkansas, in January 1970, and then an additional one hundred one miles to Fort Smith, Arkansas, in June of that year. As a result, the cost of nonrail transportation

to the New Orleans area had been substantially reduced.

Dreyfus protested the proposed rate reductions because they did not apply to Pascagoula, Mississippi. Pascagoula is not served directly by MoPac; shipments from MoPac origin stations along the Arkansas River must come through Memphis, Tennessee, or New Orleans, where they are switched to lines of connecting carriers serving Pascagoula. Rates for such joint hauls are set by agreement between the carriers. Dreyfus claimed that MoPac's failure to seek a corresponding rate reduction from connecting carriers for joint hauls to Pascagoula would effectively shut Dreyfus out of the export market for wheat and soybeans grown along the Arkansas River, and that instead of trying to meet increased barge competition, MoPac was really trying to promote shipments to destinations served directly by MoPac as opposed to those served by joint hauls.[3]

On October 2, 1970, the Commission stayed the effective date of the proposed rates in order to conduct an investigation of their lawfulness. However, the stay expired prior to any decision, and the rates went into effect on July 2, 1971.[4]

The Commission's employee Review Board Number 4 issued its order on May 3, 1972 upholding reduced rates on two of the three types of carload ship-

---

1. The rate reductions applied to certain shipments of soybeans in boxcars (subject to a minimum weight of 100,000 pounds), soybeans or wheat in boxcars (subject to a minimum weight of 120,000 pounds), and soybeans or wheat in covered hopper cars (subject to a minimum weight of 180,000 pounds).

2. Some of the destination points are located on the lines of the New Orleans & Lower Coast Railroad Company and the Texas & Pacific Railroad Company, which are considered part of the MoPac system.

3. Dreyfus was joined in its protests by Midwestern Grain Corporation and Bunge Corporation, both of which operated export facilities at Destrehan, Louisiana, only fourteen miles northwest of New Orleans on the

Mississippi River. Destrehan, like Pascagoula, was not served directly by MoPac and was not included in the rate reductions. Bunge and Midwestern Grain, however, have not joined Dreyfus in the present action, and this court's consideration of the Commission's decision will focus only on Dreyfus and Pascagoula.

The Board of Trade of Kansas City, Missouri, also protested initially, however it did not even present evidence or briefs to the Commission.

4. Pursuant to 49 U.S.C. § 15(7), the Commission can suspend the effective date of proposed rates for up to seven months. In the present case the new rates were delayed an extra two months by agreement between the parties.

ments. Soybeans and Wheat, Arkansas and Louisiana to Louisiana Ports. 341 I.C.C. 898.[5] The Board found that the only way MoPac could retain any business in this area in the face of unregulated barge competition was to reduce rail rates to induce shippers to continue using rail service in preference to making heavy investments in barge-loading facilities. The verified statement of MoPac's Assistant General Freight Agent Joseph R. Duepner indicated that while in 1969 MoPac handled 226 carloads of soybeans from North Dardenelle, Little Rock and Pine Bluff, it handled only twelve carloads in the first six months of 1970. This difference was not due to any seasonal fluctuation in shipments, as evidenced by the fact that in 1969 MoPac handled sixty-nine of its ninety carloads from North Dardenelle in the first half of the year.

The Board noted that in 1969, when the river had been partially opened to barges, barges carried around 35,000 tons of wheat and soybeans. In the first eleven months of 1970, when the river was opened first to Dardenelle and then to Fort Smith, barge traffic increased to almost 100,500 tons. This amount was expected to increase, absent a rail rate reduction, because more shippers would construct barge-loading facilities.[6] The Board indicated that even with the rate reduction, rail rates to the allegedly preferred ports were still higher than published, regulated barge rates to New Orleans, or even Pascagoula. However, wheat and soybeans often move by barge shipments which are exempt from the published tariffs.

Because of the severe barge competition, the Board did not require that the reduced rail rates make a substantial contribution to fixed overhead costs in order to be found compensatory. Instead it held that two of the three groups of rate reductions were compensatory because the rates exceeded average variable costs.[7] Although the Board noted that MoPac's cost estimates erroneously excluded a damage or loss allowance and used too low an empty re-

---

5. The matter had been assigned for handling under the Commission's "modified procedure," whereby parties submit the verified statements of witnesses, and cross-examination is permitted only where material facts are in dispute. See 49 C.F.R. §§ 1100.45–54. Here the Board permitted Dreyfus to cross-examine only one of MoPac's witnesses (its cost witness).

6. Stallings Brothers Feed Mills, an intervenor on behalf of MoPac, operates a grain elevator in Morrilton, Arkansas, on the Arkansas River. The verified statement of Alan Stallings, one of the partners, indicated that without reduced rail rates at least as low as those proposed by MoPac, his company could no longer afford to ship grain for export by rail over MoPac lines and would be forced to make a heavy investment in barge loading facilities. As of December 1970, before the proposed rates had become effective, they had obtained a permit from the Army Corps of Engineers to construct such barge facilities.

Evidence introduced by Dreyfus itself was wholly consistent with MoPac's claim that it was losing traffic as a result of increased barge competition. Dreyfus presented the following data as to carload shipments of soybeans received from MoPac origin stations to which the reduced rates would apply.

| | | Carloads of Soybeans to Pascagoula | |
| | 1968 | 1969 | 1970 |
| --- | --- | --- | --- |
| Little Rock | 80 | 9 | 3 |
| Morrilton | 28 | — | 42 |
| Pine Bluff | 50 | 40 | — |
| Portland | 66 | 34 | 52 |

With regard to Morrilton, of course, Stallings had not yet constructed barge facilities and thus shipments from that company would not have been affected. Portland is not located on the Arkansas River and was not significantly affected by the opening of the river to barges. It was apparently included in the proposed rate reduction because it was an intermediate point on the line from the Arkansas River stations to the New Orleans area.

7. The rates for certain shipments of soybeans in boxcars (subject to a minimum weight of 100,000 pounds) were found noncompensatory.

turn ratio, it restated the cost estimates based on the evidence before it. Finally, even though the 1969 costs used by MoPac were understated for current 1972 levels, it found that the reduced rates exceeded the 1969 variable costs by "substantial margins sufficient to indicate that they would be compensatory at current cost levels." 381 I.C.C. at 902.[8]

With regard to the question of undue prejudice under section 3(1), the Board found that the transportation conditions justified the rate differential between the New Orleans area and Pascagoula and that there had been no evidence of injury presented by Dreyfus other than general allegations that this would shut it out of the market for export-wheat and soybeans from along the Arkansas River. The Board noted that no other port interest in Pascagoula had joined Dreyfus's protest. (Neither had any connecting carrier.) None had even submitted a statement on Dreyfus's behalf. The Board then noted that transportation conditions to Pascagoula and to New Orleans differ in several important respects. First, there is the increased barge competition from along the Arkansas River to points covered by the reduced rates. Barges also carry grain to Pascagoula, however barge rates to Pascagoula from along the Arkansas River are significantly higher than those to the five MoPac destination points in the New Orleans area, because the trip by barge is over eighty miles longer.[9] Moreover, rail shipments to Pascagoula from Arkansas River stations would be joint hauls, which generally result in additional expenses such as interchange charges not incurred in single-line service. The Board found that such expenses would be significant here be·

cause rail rates were already depressed by severe barge competition. Reducing joint-haul rates on shipments routed through Memphis, the shortest route to Pascagoula, would also probably mean that rates from intermediate MoPac stations not on the Arkansas River, and thus not affected by the increased barge competition, would also have to be reduced because generally an intermediate point cannot have a higher rate for similar shipments than a more distant point on the same line. Dreyfus's own figures also indicate that even the joint hauls through Memphis to Pascagoula were often more than one hundred miles longer than single-line hauls to New Orleans from the same origin. (R. 121–22.).

In January 1973 Dreyfus brought this action challenging the Commission's order.[10] One of Dreyfus's claims was that it should have been permitted to cross-examine each of the witnesses testifying on behalf of MoPac, instead of just the cost witness.[11] On April 18, 1973, the Commission decided to reopen its investigation and to permit such cross-examination. At a further hearing the parties could also present "such other evidence which the Administrative Law Judge deem[ed] necessary to complete the record." The present action was temporarily stayed.

The further hearing was held on August 9, 1973. The transcript indicates that at the conclusion of the cross-examination, Dreyfus sought to introduce more recent cost evidence over the strenuous objection of MoPac. Dreyfus stated that if the Administrative Law Judge would rule that MoPac had failed to carry its burden of proof, then there would be no need to introduce the further cost

---

8. The ratio of the new rates for the shipments in covered hopper cars to 1969 costs ranged from 1.31 to 1.89. For the boxcar shipments (subject to the minimum weight of 120,000 pounds) the ratios of rates to 1969 costs varied between 1.16 and 1.57.

9. Barges to Pascagoula from the Arkansas River area must continue down the Missis-

sippi River past New Orleans to the Gulf, and then swing east along the coast.

10. Dreyfus had previously petitioned the Commission, for a rehearing, which was denied.

11. See note 5, supra.

study. The judge declined to make such a ruling, but permitted Dreyfus to introduce its more recent study. Thereupon MoPac introduced more recent cost evidence as well.

On January 25, 1974, in a report and order based upon the further hearing, Appellate Division 2 of the Commission held that the rates applicable to soybeans or wheat in covered hopper cars (subject to a minimum weight of 180,000 pounds) were compensatory. (MoPac had earlier withdrawn the reduced rate applicable to boxcar shipments of soybeans or wheat which the Board had found compensatory in the earlier report.) Focusing on the more recent cost data, the Commission found MoPac's new cost study to be unreliable and did not attempt to restate the estimated costs as the Board had done earlier. Instead it relied upon Dreyfus's own cost study of MoPac's operations and concluded that the rates were compensatory.

With respect to the section 3(1) issue, the Commision noted that the level of unregulated barge rates was not in the record. Nevertheless, it stated that the record upon which the initial report had been based had indicated that MoPac's traffic was so threatened with barge competition as to justify the rate reduction and the modification of prior rate relationships between Pascagoula and the Mississippi River ports. The Commission found that MoPac had made a prima facie case of lawfulness under section 3(1), and that Dreyfus had not rebutted it by introducing any evidence from which the Commission could conclude that it had been unduly prejudiced. The Commission stated that it would not find undue prejudice on the basis of the record before it, and held that the rate differential between the five Louisiana ports and Pascagoula was justified by transportation conditions.

Dreyfus then renewed the present action and this three-judge court was convened on May 6, 1974.

## II. Scope of Review

■ Commission "action, findings, and conclusions" will be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" if they fail to meet statutory, procedural, or constitutional requirements; or if they are not supported by "substantial evidence." 5 U.S.C. § 706(2)(A)–(E). See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–414, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971). Nevertheless, our scope of review is narrow. Under the "arbitrary and capricious" standard, Commission action must be sustained if there is a rational connection between the facts found and the conclusions reached. *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Insofar as Dreyfus bases its challenge to the Commission's findings on 5 U.S.C. § 706(2)(E) our scope of review is confined to determining whether those findings are supported by "substantial evidence." "Substantial evidence" has been defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 . . . [A]nd the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). In essence, we are limited in this proceeding "to ascertaining whether there is warrant in the law and the facts for what the Commission has done." *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946); *Salem Transportation Co. v. United States*, 285 F.Supp. 322, 324 (S.D.N.Y.1968).

### III. Whether the Rates were Compensatory

Dreyfus challenges the Commission's finding that MoPac's reduced rates were compensatory, and therefore not unjust or unreasonable within the meaning of 49 U.S.C. § 1(5). It contends that the Commission was unwarranted in using Dreyfus's cost study to find that the rates were compensatory and instead should have found that MoPac had failed to discharge its burden of proof. Dreyfus further contends that if the Commission was warranted in using Dreyfus's cost study, then it erred in not considering the entire cost study and in failing to consider the testimony of MoPac's cost witness Richter on cross-examination concerning the size of the margin between costs and revenues on certain boxcar shipments regarded as insufficient by MoPac.

■ Dreyfus's contention that the Commission was unwarranted in using plaintiff's cost study to support its finding that MoPac's reduced rates were compensatory is without merit. Although MoPac had the burden of showing that the rates were compensatory, that burden may be met by any other evidence in the record, including the evidence introduced by Dreyfus. See *Burroughs Corp. v. Rocky Mountain Prestress, Inc.*, 431 F.2d 1185 (10th Cir. 1970); *Van Sant v. American Express Co.*, 169 F.2d 355 (3d Cir. 1948).

■ Dreyfus's exhibit H–11, Table 1 (Second Report, at 9–10) reflects costs as of January 1, 1973, and rates as of the Ex Parte 281 level, which had been in effect since early 1972. At January 1, 1973 costs, Dreyfus's evidence indicates that MoPac's reduced rates were compensatory overall. However plaintiff's cost witness testified that to reflect cost and rate levels as of May 1, 1973, the cost figures indicated on exhibit H–11, Table 1 would have to be increased by a factor of about 2.8 percent. Rates, on the other hand, would continue to remain at the Ex Parte 281 level. Dreyfus argues that at May 1, 1973 costs, its evidence indicates that of sev-enty origin-destination combinations sampled, in twenty-five cases costs exceeded rates, and in fifteen others the excess of revenues over costs was less than one cent per hundred pounds—a margin which MoPac had considered too low when it withdrew the reduced rates on boxcar shipments of wheat and soybeans. (Cross-examination of Harold Richter, MoPac's cost witness, R. 598). Dreyfus claims that such rates are not compensatory overall.

The fact that MoPac had in another situation considered a margin of less than one cent per hundred pounds too low does not bind it here, and thus Dreyfus's claims that the rates are non-compensatory overall are overstated. Moreover, difficulty in selecting the date for comparing costs and revenues in order to determine whether rates are compensatory arises from the circumstance that rate increases generally lag behind cost increases. At the time of the further hearing on August 9, 1973, a three-percent rate increase was under consideration by the Commission. This increase became effective on an interim basis on August 19, 1973, and on that date MoPac's rates would probably have been more compensatory than on the May 1, 1973 date sought by Dreyfus. The increase became permanent on December 27, 1973, by which time costs would probably again have risen somewhat without a corresponding rate increase. In view of these factors, the Commission's choice of January 1, 1973, as the date for comparing costs and revenues, instead of May 1, 1973, as sought by Dreyfus, was not without rational basis.

The Commission's finding that MoPac's reduced rates were compensatory and therefore not unjust or unreasonable within the meaning of 49 U.S.C. § 1(5) is supported by substantial evidence and is not arbitrary or capricious.

### IV. Whether Dreyfus was Unduly Prejudiced

■ Dreyfus also attacks the Commission's decision that the rate reduc-

tion was not unduly prejudicial to Pascagoula, within the meaning of 49 U.S.C. § 3(1), in light of the differing transportation conditions to the New Orleans area and to Pascagoula, and the lack of any evidence offered by Dreyfus at the second hearing to show the extent to which its competitive position had been altered during the years in which the reduced rates had been in effect. We conclude that the finding of the Commission is supported by the record and find plaintiff's arguments to be without merit.

Plaintiff initially complains that the Commission did not explain how, "if the level of unpublished rates has not been established herein," Second Report, at 3, it could conclude that such a substantial rate reduction was required by barge competition and that the rate differential was justified by transportation conditions. The Commission statement relied upon by Dreyfus appears to have been based upon the fact that at the second hearing Duepner stated upon cross-examination that he did not know the present level of unregulated barge rates and that it was possible that they exceeded the published barge rates for nonexempt shipments at that particular moment. However, the Commission's statement does not seem to have been intended as a rejection of the conclusions in the prior report that barge rates were very low, that barge competition was severe, and that barge rates to Pascagoula were higher than to New Orleans. There was ample other evidence before it to support those findings. The published barge rates, which were of record, were certainly evidence as to the general level of unregulated barge rates, even if the latter fluctuated substantially at times. Similar indications of low barge rates were the increasing barge traffic on the river, MoPac's evidence that its shipments to Gulf ports from Arkansas River origins had fallen off dramatically, and one shipper's testimony that without this rate reduction he could no longer afford to ship by rail and would

have to make a substantial investment in barge loading facilities.[12] Finally it can be noted that Dreyfus itself could also have introduced specific evidence of the unregulated barge rates on shipments it received, if it thought they were really higher than the evidence suggested. And it should be noted that in its initial protest to the Commission, Dreyfus stated that the reduced rates could not be justified as an attempt to meet barge competition, as "the plain fact of the matter is that the proposed rate reductions to New Orleans are not low enough to meet water competition." Protest and Petition for Suspension and Investigation, 8 (Sept. 18, 1970) (R. 20).

Dreyfus argues further that MoPac failed to prove that the latter had lost substantial traffic to barge competition, or that such losses were threatened. It argues that Duepner's testimony as to a drop in MoPac shipments was not credible because he failed to produce documentary support previously requested for the figures given in a computer printout he relied upon. Duepner had claimed that the documents were destroyed in the ordinary course of business and that the print-out was accurate. Duepner's credibility was for the Commission to consider. However we note that there was additional evidence supporting the loss or threatened loss of traffic—for example, the low level of published barge rates and the threatened loss of rail shipments from particular shippers.[13]

■ Plaintiff makes the further argument that the Commission relied unreasonably upon Dreyfus's failure to introduce evidence at the further hearing as to the effect the reduced rates had had on its competitive position in the two years they had been in effect. It maintains that such evidence was neither required nor requested by the Commission, and that MoPac had the burden of proof. The Commission indeed recognized that MoPac had the burden of proof on the issue of undue prejudice

---

12.  See note 6 supra.

13.  See note 6 supra.

and the lawfulness of the rates under section 3(1),[14] and it found specifically that MoPac had made a prima facie case which had not been adequately rebutted by Dreyfus.

In rejecting Dreyfus's argument we note first that Dreyfus had notice from the initial report that the Commission was skeptical of unsupported general allegations of injury, especially when the party best able to produce such evidence was Dreyfus. Moreover, Dreyfus cannot now claim that it did not think such evidence could be introduced at the second hearing, when no attempt to introduce it was made and when Dreyfus successfully argued that recent cost evidence was crucial and should be considered by the Commission.

We find substantial evidence in the record to support the Commission's determination that the reduced rates are not unlawful under section 3(1). Increased barge competition forced MoPac to reduce its rates very close to average variable costs. Indeed the Commission found one class of rate reductions noncompensatory; MoPac subsequently withdrew another rate reduction because of increasing costs; and Dreyfus seriously contends that even the remaining rates are noncompensatory. Nevertheless, Dreyfus asks that MoPac be required to seek to establish joint-haul rates to Pascagoula equivalent to its single-haul rates to the New Orleans area, despite the additional costs involved in such joint hauls (e. g., interchange costs, greater distances), whether routed through Memphis or New Orleans. We hold that the Commission could properly take these factors into account, along with the lack of evidence presented by Dreyfus indicating that it had been unduly prejudiced. It could also take into account the fact that barge rates to Pas-

cagoula are significantly higher than to New Orleans. See generally, *Barringer & Co. v. United States*, 319 U.S. 1, 63 S. Ct. 967, 87 L.Ed. 1171 (1943); Ex parte Soybeans, Southwest and South to Gulf Ports, 309 I.C.C. 445, 465-67 (1960). In these circumstances we find that the Commission acted reasonably in concluding that no undue prejudice was caused by MoPac's reduced-rate schedule, within the meaning of section 3(1).

The Commission's findings that MoPac's reduced rates were compensatory and therefore not unjust or unreasonable within the meaning of 49 U.S.C. § 1(5) and that Dreyfus was not unduly prejudiced within the meaning of 49 U. S.C. § 3(1) are supported by substantial evidence, are not arbitrary or capricious, and are not otherwise without warrant in law or fact. Accordingly, the complaint is dismissed.

So ordered.

---

14. Where preexisting rates are challenged, the protestant has the burden of proving that the rates are unlawful. However, when preexisting rates are challenged under section 3(1) as being unduly prejudicial, the protestant has the burden of establishing injury and the railroad has the burden of justifying any disparity by reference to transportation conditions. *Chicago Board of Trade v. Illinois Central RR. Co.*, 344 I.C.C. 818 (1973), aff'd, *Chicago & Eastern Ill. RR. Co. v. United States*, 384 F.Supp. 298 (N.D.Ill. 1974).