**ALUMINUM COMPANY OF AMERICA, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Atchison, Topeka & Santa Fe Railway, et al., Intervenors.**

**No. 77–1438.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 1978.

Decided Aug. 2, 1978.

Petition for Review of an Order of the Interstate Commerce Commission.

Dickson R. Loos, Washington, D. C., with whom Barry Roberts, Washington, D. C., was on the brief for petitioner.

John J. McCarthy, Jr., Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I. C. C., Barry Grossman and Frederic Freilicher, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents.

Don McDevitt, Chicago, Ill., was on the brief for intervenor.

Alan J. Thiemann and David Popowski, Attys., I. C. C., Washington, D. C., entered appearances for respondent Interstate Commerce Commission.

Before TAMM and ROBB, Circuit Judges, and DAVIES,* United States District Judge for the District of North Dakota.

Opinion for the Court filed by ROBB, Circuit Judge.

ROBB, Circuit Judge:

The Aluminum Company of America (Alcoa) petitions for review of an order of the Interstate Commerce Commission (ICC) upholding a rate increase for shipments of petroleum coke in the Southwest Freight Bureau (SWFB) territory.[1]

In 1975 the SWFB filed with the ICC a proposed rate increase for petroleum coke within the Southwestern territory and between the Southwestern territory and other territories. When two large consumers of petroleum coke,[2] Alcoa and Reynolds Metals Company, filed protests, the ICC suspended the proposed rates until May 1976 and ordered a hearing under the modified procedure to determine whether the rates were just and reasonable. See 49 C.F.R. §§ 1100.43–.54 (1976). Review Board Four found the rates to be just and reasonable because "the comparisons of revenues to costs, when considered in the light of the rate comparisons [to the adjacent Western Trunk Line (WTL)[3] territory], are indicative of rates below the maximum reasonable level." (J. A. 234) The Commission, Division Two, with one commissioner dissenting in part, denied reconsideration and Alcoa brought the case here.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. This territory includes Arkansas, Louisiana, Oklahoma, Texas, and parts of New Mexico and Missouri.

2. Petroleum coke is a by-product of petroleum refining used extensively in the production of aluminum. Raw petroleum coke must be calcined, or dried, before it can be used by the aluminum industry. The raw coke is shipped

from the refinery to a calcining plant where approximately 30% of its weight is lost in the drying process. Once dried it is shipped to aluminum smelters located around the United States.

3. This territory lies north of the Southwestern territory. With minor exceptions it is bounded on the north by the Canadian border, on the west by the Rocky mountains, and on the east by the Mississippi River.

Alcoa argues that the ICC decision should be vacated because the railroads' cost evidence did not support the decision, because the cost evidence is inconsistent with ICC decisions rejecting the use of unweighted territorial average costs, and because the rate comparison with the adjacent WTL was improper. Because we conclude that the ICC has failed to explain adequately the basis of its comparison to the rates in the adjacent WTL territory, we remand to the Commission for further consideration.

## COST EVIDENCE

Before the Board Alcoa raised a number of objections to the cost evidence. In its decision the Board accepted three of Alcoa's objections, restating the evidence to correct the errors identified by Alcoa. The Board refused, however, to make adjustments for multiple car shipments and for shipper-owned cars which Alcoa contends reduce the cost of service.

### A.

Regarding the multiple car shipments, the Board concluded that the Rail Form A unit costs relied upon by the railroads represented a reasonable cost approximation in view of the relatively small number of carloads of petroleum coke normally handled as a unit each day. The Board also pointed out that Alcoa had not attempted to measure the economies it asserted were to be realized from handling multiple carloads.

■ Alcoa relies heavily upon evidence in the record that the calcining plant at Enid, Oklahoma receives an average of 18 carloads per day of raw coke and ships out an average of 13 carloads per day of calcined coke. Alcoa argues that Commission precedent requires that reduced costs resulting from the handling of multiple car shipments be considered in determining the rea-

sonableness of rates. *Petroleum Rail Shippers' Ass'n v. Alton & S. R.*, 243 I.C.C. 589, 650 (1941); *see Increased Rates on Coal, Arkansas and Oklahoma to Texas*, 356 I.C.C. 568, 574 (1977). It appears however that the figures on the average carloads per day handled at Enid, Oklahoma are deceptive. The arrivals at Enid come from Amarillo, Texas to the west of Enid and from Houston to the south, from McPherson and Wichita, Kansas to the north and from Coffeyville, Kansas and Ponca City, Oklahoma to the east. Even allowing for a generous amount of circuity in routing, it is apparent that the 18 carloads per day converge upon Enid from four different directions and do not move together as a unit. Thus the actual number of cars in the multiple car shipments is substantially less than the 18 claimed by Alcoa.[4] The same is true of the 13 carloads per day shipped out of Enid. Almost half go to Sandow, Texas, and the remainder to points in Tennessee, North Carolina, and Indiana. Furthermore, we note that these figures are averages rather than regular shipments of specific numbers of cars. At best, the evidence as to multiple car shipments is inconclusive. Considering all these factors, we cannot say that the Board's rejection of a multiple car shipment adjustment was irrational.[5]

### B.

The shipper-owned car adjustment, which Alcoa contends should have been made, presents a more difficult question. The Board rejected this adjustment because some of the savings realized by the railroads from the use of shipper-owned cars are offset by mileage payments made to the owner.

In support of the Review Board decision, counsel for the ICC points to evidence in the record that using shipper-owned cars actually costs the railroads 5¢ per mile

---

4. Indeed, it appears that less than 1 carload per day arrives from McPherson, Kansas to the north of Enid.

5. We also reject Alcoa's claim that the Board improperly shifted the burden to Alcoa on this point. The evidence submitted by the railroads

supports the use of Rail Form A unit costs as a reasonable approximation of costs in this case and the Board so held. Alcoa cannot put the railroad to further proof without bringing forward some evidence that the use of Rail Form A data is not as reasonable as it appears to be.

more than the use of their own equipment. Clearly, if this evidence were credited, it—without more—would dispose of Alcoa's contention, but the Review Board did not rely upon it. Although the Board acknowledged that the railroads realize some savings from the use of shipper-owned cars, it concluded that such use is confined to the SWFB territory whereas nearly all of Alcoa's traffic involves interterritorial movement in carrier-owned cars. Accordingly, the Board gave no weight to the factor of shipper-owned cars. Alcoa challenges this conclusion.

The Review Board does not reveal the basis for its conclusion that the use of shipper-owned cars is limited to SWFB territory. Apparently the Board relied on the testimony of Alcoa's witness, Gunter. He testified concerning some 300 cars owned by his company, Great Lakes Carbon Corporation, which operates the calcining plant at Enid, Oklahoma and sells coke to Alcoa. Gunter stated that "[a]ll of these cars are and will be used almost exclusively in Southwestern Freight Bureau Territory." (J. A. 121) Evidently the Board took this to mean that the cars would not leave the SWFB territory and could therefore not be a factor in Alcoa's shipments which largely transit through Enid. Alcoa contends that Gunter's statement in context means the cars are used for movements involved in this proceeding, thus having an effect on Alcoa's shipments. We note that the cars referred to are mostly open hopper cars which are used to transport raw coke, that is shipments inbound to Enid, and further, that Enid receives substantial shipments from outside the SWFB territory, see page 8 infra; thus it would seem that Alcoa's shipments may in fact involve shipper-owned cars. Rather than address this argument, however, counsel for the Commission chooses to rest upon the contention that the evidence in the record shows hauling in shipper-owned cars is more costly to the railroads than in carrier-owned cars.

We decline to sort out these tangled arguments. We cannot uphold the Commission upon the ground urged here, for this was not the rationale of the Review Board's decision. Nor can we reweigh the evidence as Alcoa urges and resolve the questions whether Alcoa's shipments do involve shipper-owned cars and whether the use of such cars results in material benefit to the carriers. *Humboldt Express, Inc. v. ICC,* 186 U.S.App.D.C. 141, 144, 567 F.2d 1134, 1137 (1977). In view of the need to remand for other reasons discussed hereafter, we leave these questions for clarification on remand to the Commission.

C.

Similarly, we leave the question of the use of unweighted territorial averages to establish costs to the Commission on remand. The Commission argues that this issue was not presented properly to the Review Board and is thus unavailable to Alcoa here. *See United States v. L. A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952). We note that Alcoa did advert to average territorial costs in one sentence of its 20-page argument to the Review Board. In view of our remand on the rate comparison issue, however, it is unnecessary to decide whether this perfunctory reference was sufficient to apprise the Board of Alcoa's contentions. Accordingly, we do not reach Alcoa's argument that the Commission ignored its precedents, the so-called *Coal* cases,[6] said to be controlling on this question. Whether the use of average territorial costs was sound should be considered by the Commission on remand.

RATE COMPARISON

We think Alcoa's argument that the Board improperly relied upon a rate comparison as evidence of the reasonableness of the assailed rates has merit and requires a remand to the Commission for reconsideration. In its decision the Review Board attached some significance to a comparison of the proposed rates for petroleum coke in

---

**6.** Increased Rates on Coal, Arkansas and Oklahoma to Texas, 356 I.C.C. 568 (1977); Coal—

Southwestern, Western Trunkline, and Central Territories, 352 I.C.C. 594 (1976).

the SWFB territory and the same rates in the adjacent WTL territory.

One of the best tests of reasonableness is a comparison of proposed or assailed rates with rates on similar traffic in adjacent territories. Here the proposed scale rates are the same as presently apply for WTL carriers and, as respondents assert, would place competitive shippers and producers on the same rate basis.

(J. A. 230).

Summing up its decision, the Review Board stated:

Here the comparisons of revenue to costs, when considered in the light of the rate comparisons discussed earlier, are indicative of rates below a maximum reasonable level.

(J. A. 234).

Alcoa argues that this reliance upon a comparison to rates in the WTL territory was improper because there is no evidence of similarity of conditions between the two territories nor any evidence that traffic actually moved at the WTL territory's rates.

██ The Commission's decisions establish that to be of any probative value the compared rate must apply to territory with similar terrain and other transportation conditions affecting cost, and that there must be evidence that it is a rate which is actually used rather than being one set in a vacuum. *See Increased Rates on Coal, Arkansas and Oklahoma to Texas,* 356 I.C.C. 568, 574–75 (1977); *Ellingson Lumber Co. v.*

*Great Northern Ry. Co.,* 310 I.C.C. 249, 253 (1960); *Distribution Rates—Central Freight Trucking Inc.,* 306 I.C.C. 769, 771 (1959).

The Commission argues that comparison with rates in the WTL territory is justified because there is evidence in the record of movements of petroleum coke in that territory. Alcoa's witness, Gunter, and the railroads' witness, Wegner, testified to substantial traffic between points in Kansas, a part of the WTL territory, and Enid, Oklahoma, a part of the SWFB territory. Further, the Commission argues, Alcoa has not demonstrated that the circumstances and conditions in the WTL territory are not similar to those in the SWFB territory.

The difficulty with both the Commission's and the railroads' evidence is that all movements from Kansas to Enid apparently were made under transit arrangements.[7] Thus the evidence does not support a finding that any traffic moved at the WTL territory rates; at best it demonstrates that traffic moved at the WTL proportional rates for inbound shipments moving under a transit arrangement.

██ It may be that such a comparison to the rates in the WTL is reasonable. But the Commission's cases indicate that such comparisons are valueless without evidence that the conditions are similar and the compared rates were set competitively. The Review Board referred to no such evidence and we are unable to find any.[8] Thus to

---

[7]. A transit arrangement is a rate accommodation designed to permit a shipper to unload commodities at a point enroute—here the calcining plant at Enid, Oklahoma—and reship them in the same or processed form without having to pay full rates for each segment of the entire route. *See* Transit on Cottonseed at Quanah, Texas, 232 I.C.C. 183, 188 (1939).

[8]. At oral argument Commission counsel advised us that the WTL territory encompasses only the Plains states which, like the SWFB territory, are largely flat. The short answer to this is that counsel may not supply *post hoc* what the Commission has failed to determine. *Federal Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9

L.Ed.2d 207 (1962). Nor can we take judicial notice of the similarity of transportation conditions in the two territories. Whether similarity of terrain is sufficient to establish similarity of conditions is for the Commission, not the court, to decide.

We also reject counsel's argument that "Alcoa has not demonstrated that . . . conditions . . . [are] anything but similar." ICC Brief at 28. It is not for Alcoa to do so. Were Alcoa attacking a previously established rate on grounds of discrimination among similar areas, for example, then Alcoa might have to make such a showing. But when the Commission, passing upon the reasonableness of a rate, chooses to rely upon a comparison to an adjacent territory, then the Commission must explain its basis for doing so.

the extent that the that the Review Board's decision relied upon a rate comparison, it represents an apparent, unexplained departure from precedent which cannot withstand review. *Secretary of Agriculture v. United States,* 347 U.S. 645, 652–54, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); *see Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (plurality opinion).

The Commission suggests in its brief that the Review Board relied upon the rate comparison in only a "limited" way. However we cannot indulge in such an assumption without usurping the Commission's function. We must review the decision as we find it. Certainly the language, quoted above at - —- - —— of 189 U.S.App. D.C., at 1007–1008 of 581 F.2d, does not reveal the degree of importance placed upon the rate comparison by the Board. It is fair to infer some significance however, and Commission precedent is clear that the basis for a comparison of rates must be demonstrated before any significance can attach to it. This basis is wholly lacking in the decision or record before us. Therefore we must remand to the Commission for further consideration.[9]

*So ordered.*

---

9. This proceeding was initiated in 1975, prior to the enactment of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94–210, 90 Stat. 31. The Review Board issued its decision on August 20, 1976, prior to the promulgation of the regulation defining market dominance, as required by section 202(b) of the Act. 90 Stat. 35–36, *amending* 49 U.S.C. § 1(5)(d). Thus the Commission in this case did not make a preliminary determination of market dominance to determine its jurisdiction to rule whether the rates in question were just and reasonable. On remand, however, this question will arise. For the reasons expressed in our decision in *Potomac Electric Power Co. v. ICC,* 189 U.S.App.D.C. ——, 584 F.2d 1058, decided today, we think the Commission should apply the law as amended by the Railroad Revitalization and Regulatory Reform Act.