NEW ENGLAND GRAIN AND FEED
COUNCIL et al., Petitioners,

v.

UNITED STATES INTERSTATE COM-
MERCE COMMISSION and United
States of America, Respondents,

Certain Railroads Represented by South-
ern Freight Association Eastern Rail-
roads, New England Governors' Confer-
ence, Intervenors.

The BALTIMORE AND OHIO RAIL-
ROAD COMPANY, Boston and Maine
Corporation, the Chesapeake and Ohio
Railway Company, Consolidated Rail
Corporation, Delaware and Hudson Rail-
way Company, Maine Central Railroad
Company, and Norfolk and Western
Railway Company, Petitioners,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

New England Governors' Conference,
New England Grain & Feed Council
et al., Intervenors.

Nos. 77–1324, 77–1396.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 28, 1978.

Decided April 12, 1979.

Jerome M. Alper, Washington, D. C., with whom Cheryl C. Burke, Washington, D. C., was on the brief for New England Grain and Feed Council, et al., petitioners in No. 77–1324 and intervenors in No. 77–1396. William H. Horkan also entered an appearance for New England Grain and Feed Council, et al., in No. 77–1324 and intervenor in No. 77–1396.

Peter J. Hunter, Jr., Roanoke, Va., with whom John A. Daily, Philadelphia, Pa., was on the brief, for petitioners in No. 77–1396.

Christine N. Kohl, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Robert S. Burk, Deputy Gen. Counsel, I. C. C., Barry Grossman, Catherine G. O'Sullivan, and Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Frederick W. Read, III, Atty., I. C. C., and Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., also entered appearances for respondents.

Andrew C. Armstrong, Hyannis, Mass., of the bar of the Supreme Court of Massachusetts, pro hac vice, by special leave of Court, with whom John A. Daily, Philadelphia, Pa., and Peter J. Hunter, Jr., Roanoke, Va., were on the brief, for Eastern Railroads, intervenor in No. 77–1324. Wandaleen Poynter, Jacksonville, Fla., was on the brief for Southern Freight Ass'n Railroads, intervenors in No. 77–1324.

Before BAZELON, TAMM and ROBINSON, Circuit Judges.

Opinion for the Court filed by ROBINSON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In 1973, at the instance of New England agricultural groups, the Interstate Commerce Commission undertook an investigation into the feasibility of reducing the rates for shipping feed corn from the Midwest to the Northeast.[1] The agricultural groups had proposed that self-unloading water carriers transport the grain across the Great Lakes, where unit-trains[2] would take over the cargo and carry it to the Northeast. This idea intrigued the Commission, so it instituted an investigation, making it clear that the Northeast agricultural groups, extensive users of feed grain from the Midwest, would have the burden of showing the cost of the proposed service and the economies it was expected to yield. The Northeast groups did not produce this information, however;[3] instead, the proceeding digressed into an assault upon the rates charged by railroads hauling feed corn from the Midwest to the Northeast. The Commission's handling of that attack is the matter now under review.[4]

The challenged rates are unquestionably higher than those for equivalent shipments from the Midwest to the South. In No.

---

1. *Feed Grains to New England* (I.C.C.Rep. & Order of July 13, 1973), Joint Appendix (J.App.) 123–126.

2. "Unit-train service is a system in which cars and locomotives are joined for an uninterrupted round trip, shuttle-type service . . . ." *Potomac Elec. Power Co. v. United States,* 190 U.S.App.D.C. 77, 80, 584 F.2d 1058, 1061 (1978).

3. See *Feed Grains to New England* (I.C.C.Rep. & Order of Feb. 2, 1977), at 25–27, J.App. 62–64 (Commissioner O'Neal, concurring).

4. The Northeast is the "Official Territory" in railroad terminology. *New York v. United States,* 331 U.S. 284, 291, 67 S.Ct. 1207, 1210, 91 L.Ed. 1492, 1504 (1947).

77–1324, groups concerned with the interests of farmers in the Northeast—the agricultural petitioners—argue that the differential indicates that the rates for shipments to the Northeast are both unreasonable and unduly discriminatory in violation of Sections 1(5)[5] and 3(1)[6] of the Interstate Commerce Act. The Commission held generally that the agricultural petitioners had not adequately supported these contentions,[7] but did grant some minor relief, including the establishment of ten-car rates, which presumably will be lower on a per-pound basis than existing single-car or three-car rates.[8] In No. 77–1396, the railroads object to that part of the Commission's order as an exercise beyond its authorized powers or at least an unexplained deviation from past principles. We affirm the Commission's action in all respects.

I

■ By the doctrine of "relative unreasonableness," the unreasonableness of a rate may be demonstrated by showing a significant disparity between that rate and a rate for substantially the same service in a comparable area.[9] But, as we recently underscored, "[t]he Commission's decisions establish that to be of any probative value the compared rate must apply to territory with similar terrain and other transportation conditions affecting costs . . . ."[10] The onus of establishing the unreasonableness of particular rates is on the assailant.[11]

■ In the proceeding under review, the evidence adduced before the Commission indicated an elevated rate profile for some rail services in the Northeast when compared with rates in the South, and the Commission acknowledged as much.[12] The railroads, however, countered with unrebutted cost data suggesting that over half of the disparity was attributable to divergences in operating costs,[13] and with evidence that the remainder was the result of re-

**5.** 49 U.S.C. § 1(5) (1976). Since we sustain the Commission's determination that the agricultural petitioners have not shown that the challenged rates are unreasonable, we need not decide whether the amendment to § 1(5) wrought by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, 34–35, passed while this proceeding was before the administrative law judge, modifies or abrogates the doctrine of relative unreasonableness. See 49 U.S.C.A. § 1(5) (West Supp.1978), providing that the Commission may not find a rate to be unreasonably high "unless the Commission has first found that the proponent [railroad] carrier has market dominance over such service."

**6.** 49 U.S.C. § 3(1) (1976).

**7.** *Feed Grains to New England, supra* note 3, at 11–22, J.App. 48–60.

**8.** *Feed Grains to New England, supra* note 3, at 23–25, J.App. 60–62.

**9.** See, *e. g., Sterling Colo. Beef Co. v. Atchison, T. & S. F. Ry. Co.,* 339 I.C.C. 530 (1971); *Port of New York Auth. v. Aberdeen & R. R.R. Co.,* 321 I.C.C. 738 (1964); but see *Southeastern Ass'n of R. & Util. Comm'rs. v. Atchison, T. & S. F. Ry.,* 321 I.C.C. 519, 545 (1964) (doctrine of relative unreasonableness inapposite where issue is maximum reasonableness).

**10.** *Aluminum Co. of America v. ICC,* 189 U.S. App.D.C. 226, 230, 581 F.2d 1004, 1008 (1978);

see *Louisville & N. Ry. v. United States,* 238 U.S. 1, 15–16, 35 S.Ct. 696, 700, 59 L.Ed. 1177, 1182 (1915).

**11.** See *Atchison, T. & S. F. Ry. v. Wichita Bd. of Trade,* 412 U.S. 800, 812–813, 93 S.Ct. 2367, 2377–2378, 37 L.Ed.2d 350, 365 (1973) (plurality opinion). As we recently had occasion to note, "in assailing published rates as unreasonable and requesting the Commission to prescribe just and reasonable rates, the complainant bears the burden of proving the alleged unreasonableness." *Potomac Elec. Power Co v. United States, supra* note 2, 190 U.S.App. D.C. at 81, 584 F.2d at 1062, citing *Swift & Co. v. United States,* 343 U.S. 373, 382–383, 72 S.Ct. 716, 721, 96 L.Ed. 1008, 1018–1019 (1952).

**12.** *Feed Grains to New England, supra* note 3, at 9–10, 14, J.App. 46–47, 51.

**13.** The agricultural petitioners argue that this evidence was unacceptable because it was based on the average regional cost of operating covered hopper cars, and was not specifically limited to the cost of carrying corn between the Midwest and the Northeast. The Commission recognized that more detailed data would have been preferable but reasonably held that the more general evidence was sufficiently probative since the case involves comparisons between entire territories and corn is carried in covered hopper cars. *Feed Grains to New England, supra* note 3, at 13, J.App. 50; *id.* Appendix A, J.App. 65–67.

sponses to heavy intermodal competition in the South.[14] While it is settled that differences in competitive conditions may justify differences in rates,[15] the impact of truck and barge competition on railroad rates is not precisely quantifiable, and thus gauging the extent of this justification for rate variations is a task summoning application of the Commission's expertise.[16] We have been presented with no reason to question the Commission's estimation.[17]

▓▓▓ The Commission has in the past signified that rates in both the Northeast and the South are reasonable, and previously-promulgated rates bear a presumption of regularity.[18] Where, as here, the only evidence of current unreasonableness is a disparity between rates in territories with dissimilar competitive conditions, the Commission may properly determine that the challengers have not met their burden of demonstrating the unreasonableness of the assailed rates.

▓▓▓ The agricultural petitioners ascribe a further error to the Commission's refusal to find the rates on rail shipments of feed corn to the Northeast unreasonable. They characterize the holding that intermodal competition in the South rendered rates there incommensurable with those in the Northeast as an unexplained deviation from Commission precedents. Particular reference is made to *Geo. A. Hormel & Co. v. Atchison T. & S. F. Ry.*,[19] which indicates that when competition is so pervasive in a region as to make depressed rates the norm, those rates may be used as the predicate for a showing of relative unreasonableness.

While we are somewhat disturbed by the Commission's failure to explain why *Hormel* is inapplicable here, that case is sufficiently distinguishable to assure that the Commission's oversight does not present a danger that it has arbitrarily departed from its own precedents. *Hormel* concerned the reasonableness of rates for carriage of fresh meats and packing house products by rail from the Midwest to the Rocky Mountain-Pacific Coast area. Rates "between 12 important packing centers in mountain-Pacific territory," though depressed by intermodal competition, were considered "a proper guide for determining a just and reasonable rate level for the future from the Midwest to mountain-Pacific territory" because "these so-called low mountain-Pacific rates . . . appl[ied] between practically all points between which the traffic move[d]."[20] The salient feature of *Hormel* is that the rates there used for purposes of comparison were within the same territory as the rates whose reasonableness was in question. Here, by contrast, the agricultural petitioners rely upon a comparison with a

A primary reason for the higher cost is that transportation in the Northeast commonly involves many more lines. The Commission, however, did not rely simply on the fact of multiple-line hauls, but concluded that such hauls had been shown to be more expensive in this situation. *Id.* at 12–13, J.App. 49–50. Compare *Richmond County Coal Merchants Ass'n v. Baltimore & O. R.R.*, 101 I.C.C. 154, 159 (Div. 4, 1925).

14. *Feed Grains to New England, supra* note 3, at 11–12, J.App. 48–49; *Feed Grains to New England*, No. 35786 (May 17, 1976) (initial decision), at 22–24, J.App. 111–113.

15. *USEN Canning Co. v. Atlanta & W. P. R.R.*, 293 I.C.C. 679, 683 (Div. 3, 1954). See *Louis Dreyfus Corp. v. United States*, 401 F.Supp. 919 (S.D.N.Y.1975); *National Gypsum Co. v. United States*, 353 F.Supp. 941, 946 (W.D.N.Y. 1973); *Chamber of Commerce of Fargo v. United States*, 276 F.Supp. 301, 307–308 (D.N.D. 1967).

16. *Louisville & N. Ry. v. United States, supra* note 10, 238 U.S. at 16, 35 S.Ct. at 700, 59 L.Ed. at 1182–1183.

17. There is no intimation here that competition is being used as to pretext for discriminatory rates. See *id.* at 13, 35 S.Ct. at 699, 59 L.Ed. at 1181.

18. See cases cited note 11 *supra; Chicago Bd. of Trade v. Illinois Cent. R.R.*, 344 I.C.C. 818 (1973), *aff'd sub nom. Chicago & E. Ill. R.R. v. United States*, 384 F.Supp. 298 (N.D.Ill.1974), *aff'd*, 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975).

19. 263 I.C.C. 9, 43 (1945).

20. *Id.* Accord, *Fannin's Gas & Equip. Co. v. Atchison, T. & S. F. Ry.*, 298 I.C.C. 765, 771–772 (Div. 2, 1956).

territory not only distinct but strikingly different, in terms of operating costs and intermodal competition, from the one under scrutiny.

## II

 Having disposed of unreasonableness,[21] little need be said about undue discrimination,[22] for the decisions are uniform that within the zone of reasonableness[23] legitimate rate adjustments to meet competition will not be labeled unduly preferential,[24] at least in the absence of significant competitive injury.[25] The underlying philosophy is that the public interest is best served by encouraging carriers to battle intermodal competition where it exists,[26] and thus standardization of the differing rates can be justified only by a showing that competition is a mere pretext for discrimination, or that it has caused a serious competitive disadvantage to shippers in another region.[27] Since the Commission must always ensure that rates are reasonable, this course does not abandon any area to monopoly pricing.[28]

 The agricultural petitioners failed to demonstrate significant competitive injury resulting from the disparity in rates. At most they substantiated two facts: that dairy and poultry production has decreased in many parts of their region, and that transportation costs for feed corn make up about four percent of the cost of a broiler.[29] They did not, however, establish that their higher transportation costs caused any of the decreases in production.[30] And any inference of a casual nexus—which was weak to begin with, since the only interterritorial competition is in broilers and is not uniformly strong even for them—was rebutted by increased broiler production on the Delmarva Peninsula, which is in the same rate territory as New England and which faces the keenest competition from the South,

21. The agricultural petitioners also perceive unreasonableness in the failure of the mileage scale rates in the Northeast to increase as slowly for long hauls as do the Docket No. 28300 first-class rates. As the Commission explained, however, distance is not the sole factor in setting rates and this comparison does not overcome the presumption that other factors figured in the original decision to approve the rates and justify the varying progressions. *Feed Grains to New England, supra* note 3, at 20–22, J.App. 57–59. We must similarly defer, in the absence of contrary evidence, to the Commission's expertise in concluding that five-car export rates could not meaningfully be compared with three-car domestic rates because the export rates are based on broad origin and destination groupings and thus are not closely related to the mileage of the individual hauls. See *id.* at 11, J.App. 48.

22. The fact that the questioned rates are within the zone of reasonableness does not, of course, automatically preclude the Commission from finding undue discrimination. *New York v. United States, supra* note 4, 331 U.S. at 344–345, 67 S.Ct. at 1239, 91 L.Ed. at 1534–1535.

23. See, *e. g., Scott Paper Co. v. United States,* 372 F.Supp. 721, 733 (E.D.Pa.) *aff'd,* 419 U.S. 807, 95 S.Ct. 26, 42 L.Ed.2d 38 (1974) ("[t]here is no single 'reasonable' rate for a commodity. Rather, there is a 'zone of reasonableness' within which carriers are free to adjust their rates at will").

24. *L. T. Barringer & Co. v. United States,* 319 U.S. 1, 14, 63 S.Ct. 967, 974, 87 L.Ed. 1171, 1181 (1943); *Texas & P. Ry. v. United States,* 289 U.S. 627, 636, 53 S.Ct. 768, 771, 77 L.Ed. 1410, 1421 (1933); *Texas & P. Ry. v. ICC,* 162 U.S. 197, 216–217, 239, 16 S.Ct. 666, 674, 683, 40 L.Ed. 940, 946–947, 954 (1896).

25. See *ICC v. Chicago, G. W. Ry.,* 209 U.S. 108, 122–123, 28 S.Ct. 493, 498, 52 L.Ed. 705, 714 (1908); *Chicago & E. Ill. R.R. v. United States,* 384 F.Supp. 298, 300–301 (N.D.Ill.1974), *aff'd,* 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975).

26. *Texas & P. Ry. v. United States, supra* note 24, 289 U.S. at 637, 53 S.Ct. at 772, 77 L.Ed. at 1422; see *Texas & P. Ry. v. ICC, supra* note 24, 162 U.S. at 218, 16 S.Ct. at 675, 40 L.Ed. at 947.

27. See *Texas & P. Ry. v. ICC, supra* note 24, 162 U.S. at 218–219, 16 S.Ct. at 675, 40 L.Ed. at 947.

28. See 49 U.S.C. § 1(5) (1976).

29. *Feed Grains to New England, supra* note 3, at 17–18, J.App. 54–55.

30. Although the Commission may not demand "mathematical exactness," *New York v. United States, supra* note 4, 331 U.S. at 310, 67 S.Ct. at 1220, 91 L.Ed. at 1515, it was not unreasonable to conclude that the evidence here did not sufficiently support an inference of competitive injury.

and in Maine, which suffers the Northeast's highest freight costs.[31] As the Commission concluded, the agricultural petitioners simply failed to prove their case.[32]

## III

■ The railroads challenge the Commission's conclusion that their failure to set ten-car rates for shipments to the Northeast was an unreasonable practice under Section 1(6) of the Act.[33] The railroads argue that Section 1(6) cannot be applied to commodity rates such as those involved here, and that the Commission has not explained its departure from an alleged past policy of rebuffing their attempts to establish multiple-car rates. We must reject both contentions.

The first argument is based on the Supreme Court's decision in *All States Freight, Inc. v. New York, N. H. & H. R.R.*,[34] in which the Court held that the provision in Section 1(6) requiring "just and reasonable classifications" does not apply to "so-called all-commodity freight rates" but only to class rates.[35] That conclusion was

directed by legislative history indicating that Congress wished to grant the Commission indisputable authority to deal with classification practices *in class rates* because it felt that rate regulation was being circumvented by manipulation of classifications.[36] This concern did not extend to commodity rates because they "were competitively compelled reductions from whatever class rate would otherwise be applicable, and because standardization of commodity rates would have been completely inconsistent with their basic function of accommodating specific particularized competitive conditions."[37]

It cannot be gainsaid, however, that other portions of Section 1(6) extend beyond classifications and thus raise issues different from that decided in *All States*. After the phraseology scrutinized in *All States*, Section 1(6) goes on to prohibit unreasonable "regulations and *practices affecting* classifications, *rates*, or tariffs,"[38] and indubitably this plain language encompasses the remedial power asserted by the Commission in this case. We agree, then, that "*All States*

---

**31.** For example, egg production was up substantially in New England but down in the Mid-Atlantic; up in Connecticut, Maine, New York, Pennsylvania and Vermont but down in Massachusetts, New Hampshire, New Jersey and Rhode Island. *Feed Grains to New England, supra* note 3, at 14–16, J.App. 51–53. As the Commission noted, it had no reason to believe that any decreases were caused by the freight rates instead of by labor and land costs and other factors. *Id.* at 18, J.App. 55.

**32.** *Feed Grains to New England, supra* note 3, at 20, J.App. 57; see *United States v. ICC*, 352 U.S. 158, 175–176, 77 S.Ct. 241, 250, 1 L.Ed.2d 211, 222 (1956).

**33.** 49 U.S.C. § 1(6) (1976).

**34.** 379 U.S. 343, 85 S.Ct. 419, 13 L.Ed.2d 324 (1964).

**35.** *Id.* at 344, 85 S.Ct. at 420, 13 L.Ed.2d at 325–326.

**36.** *Id.* at 350–352, 85 S.Ct. at 423–425, 13 L.Ed.2d at 329–330.

**37.** *Id.* at 351, 85 S.Ct. at 424, 13 L.Ed.2d at 329.

**38.** 49 U.S.C. § 1(6) (1976) states in full:

> It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this part which may be necessary or proper to secure the safe and prompt receipt, handling, transporting, storing, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful.

The Railroad Revitalization and Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, 46, added a provision to § 1(6) dealing with demurrage charges. See 49 U.S.C.A. § 1(6) (West Supp.1978).

in no way precludes applicability of § 1(6) to 'practices' and the legislative history of that section removes all doubt." [39]

■ The only remaining question is whether the Commission departed without explanation from past precedent in ordering the ten-car practice. The railroads rely on a Commission decision disallowing multiple-car rates not shown to be necessary to prepare the carrier for competition, on the ground that such rates discriminate against small shippers.[40] The Commission has since expressly limited that decision and has "approved multiple-car rates which were established for the purpose of affording shippers an opportunity to meet market competition." [41] In general, present Commission policy is that all "economic, industrial, and transportation conditions must be considered" when dealing with multiple-car rate proposals.[42] In line with that policy, the Commission here required ten-car rates in order to improve the competitive position of Northeastern farmers. In this case of first impression on the issue of *requiring* multiple-car rates, the Commission explained that it would do so only when "there is a demand for the multi-car movements, the carriers have no effective competition, and a significant number of receivers have shown the ability to handle ten-car shipments." [43] In sum, there has been no mysterious change of course by the Commission, and since the order in question did not set rates but merely directed the railroads to establish them, the small shippers who joined in seeking ten-car rates will be protected from undue discrimination by the

normal statutory procedures attending rate proposals.

## IV

At its genesis, this proceeding focused on the agricultural petitioners' proposal for a coordinated service of self-unloading ships and unit-trains. It obviously strayed far from consideration of the feasibility of that project, and the Commission has expressed disappointment at its rather meager results.[44] From the beginning, however, the Commission notified the agricultural petitioners of the burden of proof they would have to discharge in order to warrant relief of *any* type.[45] They did not adduce data sufficient either to show unreasonable or unduly discriminatory rates or to permit informed modification of existing rate levels. And the railroads' contention that the Commission's order to establish ten-car rates exceeded its authority or ignored its precedents is without substance. The orders under review must therefore be

*Affirmed.*

---

**39.** *Baltimore & O. R.R. v. United States*, 391 F.Supp. 249, 258 (E.D.Pa.1975). The failure to establish ten-car rates was the practice found unlawful under § 1(6). The order to set such rates was issued pursuant to § 15(1). 49 U.S.C. § 15(1) (1976). See, *e. g., Burlington N., Inc. v. United States*, 549 F.2d 83, 87–88 (8th Cir. 1977).

**40.** See *Molasses from New Orleans, La., to Peoria & Pekin, Ill.*, 235 I.C.C. 485, 498 (1939). Even in that case, the Commission noted that "[u]njust discrimination . . . is a question of fact," and that "differences in the quantity shipped as a single shipment may afford a fair

and reasonable basis for differences in transportation rates." *Id.*

**41.** *Volume Rates on Processed Meal—Midwest to Ports for Export*, 322 I.C.C. 456, 459 (Div. 2, 1964).

**42.** *Grain by Rent-a-Train, IFA Territory to Gulf Ports*, 339 I.C.C. 579, 588 (1971).

**43.** *Feed Grains to New England, supra* note 3, at 24, J.App. 61.

**44.** *Id.* at 5, J.App. 42.

**45.** *Id.* at 3, J.App. 40.